UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

IN RE: )
 )
SCOTTO RESTAURANT GROUP, LLC )
 )
 )

CASE NO. 11-40506

CHAPTER 11

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO PAY, IN THE ORDINARY COURSE OF BUSINESS, CERTAIN UNDISPUTED CLAIMS OF CRITICAL VENDORS AND ESSENTIAL SERVICE PROVIDERS

Scotto Restaurant Group, LLC ("Debtor") hereby moves this Court for entry of an order authorizing the Debtor to pay certain ordinary course Critical Vendor Claims (as defined below). In support thereof, the Debtors respectfully represent as follows:

### JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The predicates for the relief requested in this Motion are sections 363(b), 503(b)(9), 549(a), and 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### INTRODUCTION

2. On September 26, 2011 the Debtor consented to the entry of an Order for Relief following the filing of an involuntary bankruptcy petition. The Order for Relief was entered on September 27, 2011 (the "Petition Date").

3. In June 2003 Scotto Holdings LLC ("Holdings") opened its first store in Charlotte, N.C. as a franchisee of the Firehouse Restaurant Group, Inc. ("Firehouse"). Firehouse is a US-based, fast casual restaurant chain that specializes in hot submarine sandwiches. As of September, 2011, there are approximately 390 Firehouse Subs locations. Holdings merged into the Debtor on June 1, 2009. Chris M. Scotto was the CEO and majority member of the Debtor, his son Justin Scotto was in charge of operations of the stores. The Debtor currently operates seven Firehouse Subs franchise locations and has approximately 100 employees.

4. Much of the Debtor's growth was funded through personal unsecured high interest (typically 8% to 12%) loans obtained by Chris M. Scotto from clients he served as a financial advisor. On occasion, Chris M. Scotto would retain a large portion of the loans as "fee" (i.e. $50,000.0 on a $150,000.00 loan), but the Debtor would make payments on the entire loan balance. The Debtor also believes that the proceeds of one or more loans intended for the Debtor's use were diverted to the personal use of Chris M. Scotto. In early 2009, Chris M. Scotto decided to retire as a financial advisor and run the Debtor on a full time basis. An inordinate amount of the Debtor's

resources were expended paying the salary and expenses of Chris M. Scotto, at one time $8,000.00 per month salary plus benefits, use of a corporate credit card, life insurance and travel expenses.

5.  In 2010, the Debtor's cash flow was such that it was not able to make payments to its lenders and pay its operating expenses, including expenses incurred by or for Chris M. Scotto. In late 2010, Chris M. Scotto separated from the Debtor and Justin Scotto became Managing Member. In October, 2010, Chris M. Scotto filed a Chapter 7 bankruptcy case. Throughout 2010 and 2011, the Debtor unsuccessfully attempted to reach agreements with its creditors concerning the repayment of the unsecured loans. On August 11, 2011, three of the unsecured creditors filed an involuntary Chapter 11 petition against the Debtor. The Debtor intends to use the Chapter 11 proceeding to review all financial transactions related to Chris M. Scotto, to attempt the recovery of any fraudulent or preferential transfers of the Debtor's assets and to reorganize its financial affairs so that it may remain an operating entity. The Debtor has relatively little secured debt, but in excess of $2,300,000.00 in unsecured non-priority debt.

6.  The Debtor continues to operate its business as Debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in these cases.

## THE DEBTOR'S CRITICAL VENDORS

7.  The Debtor is a party to seven franchise agreements with Firehouse of America, LLC. The Debtor believes that the franchise agreements are valuable assets of its estate and the Debtor intends to assume all of the franchise agreements.

8.  The Debtor is required to comply with the provisions of the franchise agreements. The franchise agreements provide in part that the Debtor is to only use vendors which have been approved by Firehouse.[1]

---

[1] 4.3. Operating Assets and Restaurant Materials. You must acquire all supplies, materials and food and beverage products for use in connection with your FIREHOUSE SUBS® Restaurant (collectively, the "Restaurant Materials") and all fixtures, furnishings, equipment signs, Art and cash registers, telecopiers and computer hardware and software (the "Operating Assets") from us (or our affiliates) or suppliers we have previously approved. We will only approve suppliers whose Restaurant Materials and Operating Assets meet the quality standards that we establish from time to time. You will only place or display at the Site (interior and exterior) such signs, emblems, lettering, logos and display materials that we periodically approve.

4.4. Changes to Approved Suppliers. If you want to propose a new supplier of Restaurant Materials or Operating Assets, you must submit to us sufficient written information about the proposed new supplier to enable us to approve or reject either the supplier or the particular items. If we have not responded within 30 days of such items, that does not meet our quality standards by giving you written notice. If we do so, you must immediately stop purchasing from such supplier or using such Restaurant Materials or Operating Assets in your FIREHOUSE SUBS® Restaurant until we notify you that such supplier or such Restaurant Materials or Operating Assets meet our quality standards. At our request, you must submit to us sufficient information about a proposed supplier and samples of the proposed Restaurant Materials or Operating Assets for our examination so that we can determine whether they meet our quality standards. We also must have the right to require our representatives to be permitted to inspect the proposed supplier's facilities at your expense. We may charge a fee for evaluating alternative suppliers of $250 per day for personnel time plus laboratory fees, professional fees and travel and living expenses as well as any other fees we pay to third parties in

9. As discussed herein, the Debtor has designated certain of the Debtor's suppliers and service providers who are either approved vendors or sole-source suppliers or whose goods or services are so critical to the Debtor's operations that the loss of their goods or services would cause immediate and irreparable harm to the Debtor's business. Accordingly, the Debtor is seeking to pay certain pre-petition claims of these vendors, service providers, and suppliers in its discretion, in order to maintain the value of its collateral and the Debtor's assets and business and to comply with the franchise agreements.

### Vendor Administrative Expense Claims

10. In the ordinary course of business, the Debtor maintains valuable relationships with its Vendors (the "Vendors") who provide the Debtor with food and goods, such as food and supplies used on a daily basis in the Debtor's restaurants, all of which are necessary to the successful operation of the Debtor's business. The Debtor believes that the majority of the Vendors' claims against the Debtor, as of the Petition Date, relate to goods received by the Debtor within 20 days of the Petition Date, which may be entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code (the "Vendor Administrative Expense Claims"). The Debtor estimates that the Vendor Administrative Expense Claims that it believes it needs to pay will not exceed $40,000.00 in the aggregate. At this time, the Debtor is not proposing to pay Vendor Administrative Expense Claims that have arisen under a pre-petition executory contract with the Debtor. Rather, the Debtor proposes that such claims may be paid (or "cured") pursuant to the assumption and assignment procedures under section 365 of the Bankruptcy Code.

### The Need to Pay Vendor Administrative Expense Claims

11. If the Debtor is not authorized to pay the Vendor Administrative Expense Claims as they become due in the ordinary course of business, its key relationships with the Vendors would be jeopardized, which in turn may frustrate the Debtor's ability to fulfill its obligations under the franchise agreements and, by extension, the Debtor's ability to continue operating and effectuate a reorganization.

12. Moreover, the Debtor is concerned that unless it is authorized to pay the Vendor Administrative Expense Claims, certain Vendors may not do business with the Debtor. Alternatively, the Vendors may continue to provide the goods, but insist on terms less favorable than those previously made available to the Debtor. By permitting the Debtor to continue to pay undisputed Vendor Administrative Expense Claims in the ordinary course of business and on terms acceptable to the Debtor, the Debtor would be able to protect and preserve the value of the assets in its estate, as well as enhance its ability to obtain trade credit.

13. The Debtor submits that the payment of certain undisputed Vendor Administrative Expense Claims, on terms and conditions set forth below, would assist the Debtor in maintaining its relationships with the Vendors and is in the best interests of the Debtor, its estate, and its creditors. Finally, the payment of undisputed Vendor Administrative Expense Claims is necessary to maintain

---

furtherance of the evaluation.

the Debtor's business in the ordinary course. Accordingly, to facilitate the continued operation of the Debtor's business, as is required under the proposed asset purchase agreement, the Debtor believe that it is necessary to obtain authority to pay the Vendor Administrative Expense Claims.

### Other Essential Service Providers

14. In addition, in the ordinary course of business, the Debtor periodically uses other essential service providers (the "Essential Service Providers"). These include Ed Lloyd & Associates, PLLC (accounting), Action Mechanical Contractors (HVAC servicing), Cintas (linen service), Ivey Exterminating (pest control), Penguin Repair (cooler repair), Squeegee Pros (window cleaning) and Town & Associates, Inc. (advertising). These providers have pre-petition claims that are not secured by a lien under state law or entitled to administrative expense priority, but whose services are nevertheless necessary to continued operation of the Debtor's business.

15. The Debtor believe that it has incurred approximately $10,000 in accrued but unpaid prepetition claims of the Essential Service Providers in the aggregate (the "Essential Service Provider Claims").

### The Need to Pay the Essential Service Provider Claims

16. The Debtor believes that it is essential that the Essential Service Provider Claims continue to be paid in the ordinary course of business. As noted above, some services and goods provided by the Essential Service Providers are unique. Furthermore, the Debtor submit that it would be difficult to identify and engage new providers of such services, particularly on short notice. If the Debtor were unable to pay the Essential Service Providers in the ordinary course of business, then the Debtor risk a delay in performance by the Essential Service Providers, which would be disruptive to the Debtor's business, as it would create an appearance of business not continuing as usual and therefore be detrimental to the retention of the Debtor's customers. It would further be in breach of the Debtor's franchise agreements.

### RELIEF REQUESTED

17. The Debtor requests the authority to pay, in the ordinary course of business and in its discretion, the pre-petition claims of the Vendor Administrative Expense Claims and the Essential Service Providers. A summary of these claims is attached hereto as Exhibit A.

18. Nothing in this Motion should be construed as an assumption of any executory contract or unexpired lease between the Debtor and any other party, nor should it be construed as a rejection of any executory contract or unexpired lease with any creditor. The Debtor reserves the right to contest the amount claimed to be due by any person or entity.

19. The Debtor proposes to condition the payment of the Vendor Administrative Expense Claims and the Essential Service Providers on the written acknowledgment of the claimants to continue supplying goods and/or services to the Debtor on terms at least as favorable as those that such Critical Vendor or Essential Service Provider provided to the Debtor before the

Petition Date. The Debtor reserve the right to negotiate new trade terms with any Critical Vendor or Service Provider as a condition to payment of its claim.

20. If a Critical Vendor or Essential Service Provider subsequently refuses to provide goods and/or services on the terms set forth above, any payment made to such Critical Vendor on account of its pre-petition claim shall be deemed to have been in payment of any then-outstanding post-petition obligations owed to such Critical Vendor or Essential Service Provider. If the paid pre-petition amount exceeds the amount of the Debtor's outstanding post-petition obligations (the "Excess Amount") to such Critical Vendor, the Excess Amount shall be deemed to be a voidable post-petition transfer under section 549 of the Bankruptcy Code. Upon any such recovery, the claim for which such payment was made shall be reinstated, subject to objection by the Debtor and other parties in interest.

## BASIS FOR RELIEF REQUESTED

### Payment of the Claims Described Herein Is Essential to Preserve The Value of the Debtor's Business through Continued Operations

21. Section 105(a) of the Bankruptcy Code empowers a court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. The purpose of section 105(a) of the Bankruptcy Code is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 Collier on Bankruptcy, ¶ 105.01 (15th rev. ed. 1997).

22. Under the "necessity of payment rule" or the "doctrine of necessity," courts often allow the immediate payment of pre-petition claims where the payments are essential to the debtor's continued operations, even though the Bankruptcy Code may not explicitly authorize payment. *See In re Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y 1989) (stating that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor"); *accord In re Just for Feet, Inc.*, 242 B.R. 821, 825 (Bankr. D. Del. 1999); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992). ). This doctrine, first articulated by the United States Supreme Court in *Miltenberger v. Logansport, C & S W. R. Co.*, 106 U.S. 286, 311-312 (1882), recognizes the existence of judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor.

23. The doctrine of necessity recognizes that paying pre-petition obligations outside of a plan of reorganization is often necessary to realize the paramount purpose of a chapter 11 – i.e., preventing the immediate liquidation of the debtor in possession and preserving its potential for rehabilitation. *See, e.g., In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (the "necessity of payment" doctrine "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus.").

24. The Debtor submit that paying the Critical Vendors and Essential Service Providers would benefit the Debtor's estate and its creditors and is necessary to preserve the value of the

Debtor's estate.

25. Although the Essential Service Provider Claims may not be entitled to administrative expense status, and the Essential Service Providers may not have liens to secure its pre-petition claims, the Debtor believes it is essential that such claims continue to be paid in the ordinary course of business. The Debtor submits that it would be highly difficult to identify and engage a new provider of such goods and services, particularly on short notice. If the Debtor were unable to pay the Essential Service Providers in the ordinary course of business, the Debtor may be unable to continue operations on a going-forward basis. The amount of the obligations owed to such creditors is minor compared to the likely disruption of the Debtor's business should such providers not continue providing services to the Debtor.

26. Similarly, section 363(b) of the Bankruptcy Code provides this Court with additional authority to grant the relief requested herein. Under this section, the Debtor may use property of its estates outside of the ordinary course of business if it is within its sound business judgment. *See Ionosphere*, 98 B.R. at 175 (affirming order authorizing payment of pre-petition wage claims pursuant to section 363(b)). In fact, some courts have employed this section to allow a debtor to pay a pre-petition claim as an outside of the ordinary course transaction. *See, e.g., In re Conseco, Inc.*, Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Dec. 9, 2002). The Debtor submits that, for the reasons discussed herein, it would be sound and prudent exercise of its business judgment to pay the Critical Vendor and Essential Service Provider Claims.

## WAIVER OF RULE 6004 STAY

27. Because the payment of the Critical Vendor and Essential Service Provider Claims is essential to prevent irreparable harm to the Debtor's restructuring efforts, the Debtor submit that cause exists for a waiver of the 10-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

WHEREFORE, the Debtor respectfully requests that the Court enter an order authorizing it to pay the Critical Vendor and Essential Service Provider Claims as set forth on Exhibit A, and that the Debtor be given such other relief as is appropriate.

Dated: September 26, 2011

THE HENDERSON LAW FIRM

James H. Henderson
State Bar No. 13536
1201 Harding Place
Charlotte, NC 28204-2826
Telephone:    704.333.3444
Facsimile:    704.333.5003

Scotto Restaurant Group LLC and Scotto Holdings LLC.
Critical Vendors Amended

| Vendor | Full Name | Amount | Notes |
| --- | --- | --- | --- |
| Action Mechanical Contractors, Inc. | Monthly and Quaterly Monthly HVAC service | $ 1,175.00 | This vendor keeps our HVAC units maintaining so they don't get dirty and clogged each month. |
| Airgas National Carbonation | CO2 for drinks | $ 725.00 | This vendor provide CO2 so we can give our customers drinks |
| B&J Peerless | needed weekly smallware equipment | $ 529.35 | This vendor allows us to get the equipment I need on a monthly basis. Smallwares such as knives, spatulas, pots and pans. Also is required to get some equipment to the mandatory switch to Coke Freestyle. |
| Carolina Cutlery | biweekly knife service | $ 309.00 | They sharpen my knives biweekly so they are sharp and food is cut the proper yield and employees don't cut themselves with a dull knife. |
| Cintas Corp. | weekly linen service for towels, aprons, mats | $ 789.10 | They clean our towels and aprons so we look fresh and presentable in front of the customer. Health inspector also requires clean linen in the stores. |
| Direct TV | TV for customers | $ 90.00 | TV required for customers. Mandatory by Firehouse. |
| Ed Lloyd & Associates PLLC | Accounting needs for financials | $ 2,500.00 | Needed to produce and complete financial reports, P and L's, and balance sheets. Needed for all financial aspects. |
| Hot Shots | Required hot sauce for customers | $ 468.16 | Required hot sauce on the counter for the customers |
| Ivey Exterminating, Inc. | Preventive Bug control | $ 135.00 | Required to have preventive bug control |
| NuCO2 LLC | CO 2 carbonation for drinks | $ 122.50 | Required CO2 for drinks for the customers |
| Penguin Repair | In store repairs on equipment currently needed | $ 1,215.50 | Needed to repair equipment on a weekly basis. More often for older equipment. Coolers breakdown |
| Sawyer's Produce | Sawyer's Produce, Daily Produce | $ 19,842.00 | Needed and required in Charlotte for Daily produce deliveries. Lettuce, Tomatoes, Onions, lemons, limes, red onions, salad mix, etc. etc. |
| Squeegee Pros | Window cleaning service required | $ 125.00 | Windows needed to be cleaned and required by Firehouse to be cleaned |
| Sygma-H FOOD | Required food vendor | $ 28,000.00 | Required by Firehouse as our weekly food vendor. Two deliveres per week per store |
| Town & Associates, Inc. | Monthly Marketing for Concord Stores | $ 235.00 | Marketing for the stores for hotel ads |

EXHIBIT A