IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | CASE NO.  11-40506 |
| SCOTTO RESTAURANT GROUP, LLC | ) | CHAPTER 11 |
| | ) | |
| | ) | |
| | ) | |
| _____ DEBTOR. | ) | |

## FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN
## OF REORGANIZATION

Scotto Restaurant Group, LLC (referred to hereinafter as "Debtor") provides this combined Fourth Amended Disclosure Statement and Plan of Reorganization ("Plan") to all known creditors pursuant to Sections 1121 and 1125 of the United States Bankruptcy Code.  The purpose of the AMENDED Disclosure Statement is to provide such information as may be deemed necessary for creditors to arrive at an informed decision in exercising their right to vote for the acceptance or rejection of the Plan. The Debtor is the proponent of this Plan.  T h e  Bankruptcy Court ("Court") has approved this document as a Disclosure Statement, such that creditors of the Debtor are allowed to vote on the Plan pursuant to the enclosed ballot and a copy of the Bankruptcy Court's Order Approving Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan, Combined with Notice Thereof (the "Notice").  Unless another a m e n d e d  P l a n  i s  m a i l e d  t o  y o u ,  t h e  t e r m s  h e r e i n  w i l l  b e  c o n t r o l l i n g u p o n  a p p r o v a l  o f  t h e  D i s c l o s u r e  S t a t e m e n t  b y  t h e  C o u r t .    The Notice will provide the deadline for filing ballots, objections to the Plan, and the date of the Confirmation Hearing on the Plan. Hereafter, any references to "Disclosure Statement" or "Plan" shall mean this Fourth Amended filing, unless specific reference is made to the Debtor's prior versions.

## I.        SUMMARY OF THE PLAN AND PROVISIONS FOR VOTING

### A.        Repayment of Creditors

The Plan is one of reorganization, as opposed to liquidation. The Plan provides for a method of repayment which depends upon the class a particular creditor is in.  Creditors should review the treatment proposed to their particular class.  The Plan will be funded with the future income of the Debtor.  The Debtor believes that the Plan is feasible.

The Plan provides for the full payment of all Allowed Claims and Administrative Expenses.  The Allowed Secured Claims of secured creditors are to be paid in full over time, and the secured creditors retain their liens on collateral until any Allowed Secured Claim is paid in full. Unsecured Creditors holding Allowed Unsecured Claims will receive pro rata distributions of the Debtor's profits after (or concurrent with, if cash flow allows) payment of Allowed Administrative, Priority and Secured Claims, with such payments to continue until all Allowed

Unsecured Claims are paid in full.  The Debtor estimates that it will have at least $150,000.00 available annually which to service its obligations under the Plan. The Plan provides that the Debtor and the Creditors' Committee reserve the right to bring Avoidance Actions. Any recovery which results from an Avoidance Action, less expenses incurred in connection the Avoidance Action, will be distributed to creditors in accordance with the provisions of the Plan. Tax Claims shall be paid over a period not exceeding four (4) years after the date of assessment. When and if the Plan is confirmed by the Bankruptcy Court, the treatment of claims in the Plan becomes a binding contract between the Debtor and its creditors.

## B.    Acceptance and Confirmation of Plan

In addition to understanding the background of this Chapter 11 proceeding and the events that have occurred therein, it is important for the creditors to have some understanding of the statutory requirements for the confirmation of the Plan.   The following is only a summary of important provisions of the applicable bankruptcy law and each creditor should consult legal counsel for advice.

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including (i) that the Plan has classified claims in a permissible manner; (ii) that the contents of the Plan comply with the technical requirements of Chapter 11 of the Bankruptcy Code; (iii) that the Plan was proposed in good faith; and (iv) that the disclosures concerning the Plan  have been adequate and have included sufficient information concerning all payments made or promised in connection with the Plan and the Chapter 11 proceedings. The Debtor believes that all of these conditions have been met with respect to the Plan.

Notwithstanding the rejection of a Plan by any class of claims whose acceptance is solicited hereby, the Bankruptcy Court may confirm a Plan if it finds that: (1) one impaired class has accepted the Plan; (2) the Plan does not discriminate unfairly; and (3) the Plan is fair and equitable with respect to any class that has not accepted the Plan. The fair and equitable standard requires that the holder of any claim or interest junior to the claims of the non-accepting class will not receive or retain under the Plan any property on account of such junior claim or interest. The Debtor hereby requests confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code, if necessary.

The Bankruptcy Code also requires that the Plan be feasible and that confirmation of the Plan be in the "best interests" of all creditors. The "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired class of claims or interests a recovery which has a present value at least equal to the present value of the Distribution which each such Person would receive if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code.

To confirm the Plan, the Bankruptcy Court must find that all of these conditions are met. Thus, even if holders of claims accept the Plan by the requisite votes, the Bankruptcy Court must make independent findings respecting the feasibility of the Plan and whether it is in the best interests of holders of claims before the Court may confirm the Plan. The Debtor believes that the Plan meets these criteria.

THE CONFIRMATION OF THE PLAN SHALL BE BINDING ON ALL PARTIES-IN-INTEREST, REGARDLESS OF WHETHER THE CLAIMS AND/OR INTERESTS OF SUCH PARTIES ARE IMPAIRED OR UNIMPAIRED AND REGARDLESS OF WHETHER THE HOLDERS OF SUCH CLAIMS OR INTERESTS HAVE ACCEPTED THE PLAN.

If the Plan is not confirmed, an alternate plan or plans submitted by the Debtor or by creditors or parties-in-interest may be confirmed by the Bankruptcy Court. Alternatively, the Debtor may be liquidated pursuant to Chapter 7 of the Bankruptcy Code and the net proceeds of such liquidation distributed to creditors. The Debtor is not able to project what effect these alternatives would have on the timing of a future payment to creditors, but believes that such alternatives would have a negative impact on the amount to be distributed because, among other things, it could result in additional administrative expenses.

**C.      Creditors Allowed to Vote: Deadline**

Creditors holding allowed claims in impaired classes are entitled to vote to accept or reject the Debtor's Plan. Creditors' ballots must be received by the Clerk of the Bankruptcy Court on or before the ballot deadline in order to be counted in determining acceptance or rejection of the Plan. Even though a creditor may not choose to vote or may vote against the Plan, the creditor will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities in each class of creditors and/or is confirmed by the Court. Creditors who fail to vote will not be counted in determining acceptance or rejection of the Plan. Allowance of a claim for voting purposes does not necessarily mean that the claim will be allowed or disallowed for purposes of distribution under the terms of the Plan. Any claim to which an objection has been or will be made will be allowed only for distribution after determination by the Court. Such determination may be made after the Plan is confirmed. After the Effective Date, the exclusive right to object to the allowance of a claim shall vest in the Reorganized Debtor and the Creditors Committee (as provided in Paragraph 7.2).

**D.      Voting Provisions**

The Plan can be confirmed by the Court if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each class voting on the Plan. In the event the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan under certain circumstances described in Section 1129(b) of the Bankruptcy Code if, among other things, the Court finds that the Plan accords fair and equitable treatment to the Class rejecting it.

**E.      Representations Limited**

No representations concerning the Debtor, particularly as to its future income, values of property, or other values set forth herein, are authorized by the Debtor other than as set forth herein. Any representations or inducements made to secure your acceptance, which are other than as contained in this statement should not be relied on by you in arriving at you decisions. Any such additional representations and inducements should be reported to counsel for the Debtor, who

in turn shall deliver such information to the Bankruptcy Court for such action as may be deemed appropriate. The values placed on the Debtor's property and summarized below are the Debtor's best estimate of the values of the property.

## II.     THE DEBTOR

### A.     History and Background of the Debtor

In June 2003 Scotto Holdings LLC ("Holdings") opened its first store in Charlotte, N.C. as a franchisee of Firehouse of America, LLC ("Firehouse"). Firehouse is a US based, fast casual restaurant chain that specializes in hot submarine sandwiches. As of April, 2012, there are approximately 500 Firehouse Subs locations. Holdings merged into the Debtor on June 1, 2009. Chris M. Scotto was the CEO and majority member of the Debtor and his son Justin Scotto was in charge of operations of the stores. The Debtor currently operates six Firehouse Subs franchise locations and has approximately 100 employees.

Much of the Debtor's growth was funded through personal unsecured high interest (typically 8% to 12%) loans obtained by Chris M. Scotto from clients he served as a financial advisor. The Debtor believes that, on occasion, Chris M. Scotto would retain a large portion of the loans as "fees" (i.e. $50,000.0 on a $150,000.00 loan), but the Debtor would make payments on the entire loan balance. The Debtor also believes that the proceeds of one or more loans intended for the Debtor's use were diverted to the personal use of Chris M. Scotto. In early 2009, Chris M. Scotto decided to retire as a financial advisor and run the Debtor on a full-time basis. An inordinate amount of the Debtor's resources were expended paying the salary and expenses of Chris M. Scotto, at one time $8,000.00 per month salary plus benefits, use of a corporate credit card, life insurance and travel expenses. The Debtor does not believe that any claims against Chris Scotto are collectible.

In 2010, the Debtor's cash flow was such that it was not able to make payments to its lenders and pay its operating expenses, including expenses incurred by or for Chris M. Scotto. In late 2010, Chris M. Scotto separated from the Debtor and Justin Scotto became Managing Member. In October, 2010, Chris M. Scotto filed a Chapter 7 bankruptcy case. Throughout 2010 and 2011, the Debtor unsuccessfully attempted to reach agreements with its creditors concerning the repayment of the unsecured loans. On August 11, 2011, three of the unsecured creditors filed an involuntary Chapter 11 petition against the Debtor. The Debtor has relatively little secured debt, but in excess of $2,300,000.00 in unsecured debt.

The Debtor has continued to operate its business as Debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. A creditor's committee was appointed on October 21, 2011.

### B.     Nature of Claims Against the Debtor

The Summary of Schedules filed with the Bankruptcy Court shows secured, priority, and unsecured claims of $269,083.42, $226,436.50, and $2,523,185.11, respectively. Several filed

claims differ significantly from the schedules.

      i.   <u>Secured claims</u>. The claim of American Honda Finance Corporation was filed in the amount of $5,233.76, which is approximately $4292.60 less than scheduled. The claim of City of Concord Tax Collector (holding statutory lien) was filed in the amount of $1,642.22, which is approximately $652.01 more than scheduled. The claim of CIT Small Business Lending, Corp ("CIT") currently stands at the amount of approximately $30,000.

      ii.   <u>Administrative Expense claims</u>. Administrative expense claims are those claims stem from 11 U.S.C. §507(a)(2) and §507(a)(3). The application of attorney fees by The Henderson Law Firm for post-petition attorney fee and costs claims of $77,352.68 was approved on 30 October, 2012, which is offset by initial retainers in the amount of $28,000. Applications for attorneys fees by Parker Poe Adams & Bernstein LLP for post-petition attorneys fees and costs totaling $53,518.92 for legal work on behalf of the Creditors' Committee were approved by Court Orders on 18 April 2012 and August 13, 2012; it is expected such claim by Parker Poe Adams and Bernstein LLP will increase due to further work in contemplation of Plan Confirmation. The Finley Group has a claim in the amount of $15,641.50 approved by the Bankruptcy Court on or about 10 September 2012 and 31 October 2012, for its work as the court-appointed Examiner in this case. Guarantor Justin Scotto holds an Administrative Expense Claim for the placement of personal funds with the law firm of Stone & Witt, PA as revealed in its Application to Employ. It is also anticipated that the law firm of Stone & Witt, PA will submit an administrative claim. Finally, accountants Ed Lloyd & Associates, PLLC has an outstanding claim in the amount of $6860 allowed by Order of the Bankruptcy Court on or about 21 February 2012.

      iii.   <u>Priority claims</u>. The amended Proof of Claim filed by the IRS on 16 October 2012 reflects a priority claim of $70,696.35 and a general unsecured claim of $21,151.79. The Proof of Claim of the NC Department of Revenue reflects a total claim of $122,119.00, of which $105,563.31 is a priority claim (for withholding and sales and use taxes). The Department of Commerce, Division of Employment SEC, filed three claims totaling $19,537.18, of which $16,358.60 is a priority claim. Mecklenburg County has filed a business personal property tax claim for $11909.92. The Department of Commerce, Division of Employment SEC has filed additional claim in the amount of $8636.37, with late penalties in the amount of $863.63, in addition to their previously filed claim. Priority claims total $214,028.18.

      iv.   <u>General Unsecured claims</u>. The claim of GUARD Insurance Group was filed in the amount of $4,721.50, which is approximately $278.50 less than scheduled. The claim of Duke Energy was filed in the amount of $5,725.58, however, the Debtor scheduled a claim in the amount of $0.00 for Duke Energy. The claim of Pawnee Leasing Corporation was filed in the amount of $20,679.46, however, the Debtor scheduled a claim in the amount of $0.00 for Pawnee Leasing Corporation. The claim of Dr. William H. Carlisle was filed in the amount of $4,718.60, however, the Debtor scheduled a claim in the amount of $0.00 for Dr. Carlisle. The claim of Burnell and Jeanine Kennedy was filed in the amount of $27,546.14, which is approximately $479.50 more than scheduled. The claim of Dr. Paul Hand was filed in the amount of $12,921.00, which is approximately $161.00 more than scheduled. The claim of Keith Holmes was filed in the amount of $27,637.81, which is approximately $479.50 more than scheduled. The claim of CIT Small business Lending was filed in the amount of $193,255.53, which is approximately

5

$11,301.53 less than scheduled. The claim of Lester B. High was filed in the amount of $769,454.85, which is approximately $15,054.90 more than scheduled. The claim of Kelly A. Holmes was filed in the amount of $55,663.21, which is approximately $1,054.90 more than scheduled. The claim of Harvey and Ruth Olivetti was filed in the amount of $76,728.01, which is approximately $1,169.70 more than scheduled. The claim of William and Maryann Holmes was filed in the amount of $138,770.26, which is approximately $2,541.00 more than scheduled. The claim of Robert and Doris Kennedy was filed in the amount of $26,851.94, which is approximately $335.30 more than scheduled. The claim of Columbia Cochran Commons, LLC was filed in the amount of $75,694.26, however, the Debtor scheduled a claim in the amount of $0.00 for Columbia Cochran Commons. The claim of Donald and Shelley Myers was filed in the amount of $975,182.67, which is approximately $17,859.80 more than scheduled. The claim of Piedmont Natural Gas Company was filed in the amount of $24.94, which is approximately $103.68 less than scheduled. Mission Valley Bank has an allowed unsecured claim in the amount of $30,891.58 by virtue of the Order Approving Settlement by the Bankruptcy Court entered on or about 26 October 2012.

### C.    Events since Bankruptcy Filing

The Debtor has continued to operate its business since the Petition Date. On August 11, 2011, the involuntary petition was filed against the Debtor and the Order for Relief was entered on September 27, 2011. On September 29, 2011, the Court approved Debtor's Motion for Order Authorizing the Payment of Pre-petition Wages and Salaries and Payment and Honoring of Prepetition Employee Policies and Benefits and an Order regarding same was entered on September 30, 2011. On September 29, 2011, the Court also approved in the interim Debtor's Motion to Use Cash Collateral and Granting Adequate Protection to Pre-petition Secured Lenders. On October 21, 2011, an Order Appointing Creditors' Committee was entered. On October 28, 2011, the Debtor filed an Application to Employ Ed Lloyd & Associates and a Motion to Authorize Payment of Pre-Petition claims to Ed Lloyd & Associates. The Bankruptcy Administrator and Creditor's Committee objected to the Debtor's Application and Motion, however, the parties resolved the objections by consent on December 14, 2011. The court entered an Order Granting the Employment of Ed Lloyd & Associates but postponed payment of pre-petition and post-petition claims to Ed Lloyd & Associates pending approval by the Court. On November 1, 2011, an Order was entered approving Debtor's Motion to Change Division from Shelby to Charlotte.

On November 1, 2011, the Court entered an Order prohibiting utility companies to discontinue service and establishing procedures for payment of adequate assurance to the utility companies. The Debtor entered into negotiations with Piedmont Natural Gas and Duke Energy to pay adequate assurance. On November 8, 2011, the Debtor filed a Motion for Authority to Dismiss a state court lawsuit in which the Debtor was a Plaintiff and on January 11, 2012, the Motion was granted. On January 5, 2012, the Court entered an Order authorizing the Debtor to pay $16,321.48 to Sawyer's Produce, a critical vendor of the Debtor. The Committee of Unsecured Creditors filed a Motion to Appoint an Examiner, in order to review pre-petition transactions of the Debtor. The Debtor did not contest this motion and it has been allowed.

Subsequent to Debtor's original proposed Disclosure Statement, objections were filed by the IRS, CIT, Blue Air 2010, LLC, and Advance Restaurant Finance, LLC. This Amended Disclosure Statement and Chapter 11 Plan seeks to quell those objections. Also subsequent to the original proposed Disclosure Statement was the request by Debtor's counsel, the Henderson Law

6

Firm, to withdraw as Debtor's counsel, which was granted on or about 25 July 2012. Thereafter, Stone & Witt, P.A. was retained by the Debtor and an Ex Parte Application to Employ was approved by the Court on or about 02 August 2012. Before said application to employ was allowed, Secured Creditor CIT filed its Motion to Appoint a [Liquidating] Trustee.

Also subsequent to the Debtor's original proposed Disclosure Statement was the completion of a "Recovery Analysis" performed by the Finley Group at the bequest of the Committee, *infra*. The Court has since approved the Debtor's First Amended Disclosure Statement as modified herein and CIT's Motion to Appoint a Liquidating Trustee has been withdrawn.

The Debtor's operations are profitable, as shown by the Debtor's monthly and quarterly reports. Moreover, due to market conditions in the food industry, the Debtor has been forced to increase its retail prices in the most recent accounting period. As a result, Debtor has realized significant increases in revenue and subsequently increasing profit margins previously lost due to higher costs of goods sold, in particular food costs. The increase of retail food prices is the direct result of drought conditions limiting supply and driving wholesale costs up. Those increased costs are now accounted for in Debtor's pricing model, further, Debtor anticipates food costs and thus retail prices in the short term to be steady, unless market conditions dictate further adjustments. With increased revenues and increased profit margins, the Debtor estimates that approximately $150,000.00 per year will be available annually for debt service during the Plan Period. Copies of the Debtor's Monthly and Quarterly Reports are available upon request to Debtor's counsel, bstone@swlawnc.com.

### III.    LIQUIDATION ANALYSIS

The Debtor believes that the continued operation of its business is the best way to ensure the highest repayment of the claims of its creditors. The tangible assets of the Debtor...food preparation equipment, furniture, fixtures and the like ("FF&E")....have little liquidation value. What value there is is subject to a lien in favor of CIT Small Business Lending Corporation ("CIT"), which is owed approximately $30,000.00. A franchise has little value without the Firehouse franchise agreement. Restaurant franchises, as a rule of thumb, typically sell for approximately three to five times net annual earnings. In 2011, the Debtor's net earnings totaled approximately $100,000.00. This would indicate a going concern value of $300,000.00 to $500,000.00. If the Debtor were to attempt the sale of all its franchises in the current market, it is uncertain whether such a sale would generate sufficient funds to pay secured creditors (owed approximately $40,000.00), priority claims (approximately $225,000.00) and current administrative expense claims (in excess of $100,000.00).

In the event that the Debtor converted its case to Chapter 7, it is highly unlikely that a trustee would continue to operate the Debtor's restaurants. Rather, CIT would be allowed to liquidate most if not all of the Debtor's cash and FF&E. Firehouse would terminate the franchise agreements with the Debtor and attempt to transfer the agreement to new owners. In addition, a conversion to Chapter 7 would trigger a host of additional claims. Such claims would include but would not be limited to priority wage claims and breach of lease claims (all of which would only dilute the claims of general unsecured creditors which are not likely to be paid anything in a Chapter 7 liquidation).

7

A liquidating Chapter 11 trustee is also not likely to generate significant proceeds relative to continued operations under a Chapter 11 plan of reorganization. Generally there is a six to twelve month marketing period for a franchise. A Chapter 11 trustee would not be able to operate the Debtor's franchises during such a marketing period. The "learning curve" for operating a Firehouse franchise is simply too steep for a Chapter 11 trustee to step in and take over day to day operations. Management of the Debtor requires close supervision of all restaurant locations and current management generally devotes six to seven days a week to the Debtor's business operations. It is unlikely that any Chapter 11 trustee would be able to devote similar time, energy and resources to a liquidation. Any new franchise owner must be trained by and approved by Firehouse prior to entering into a franchise agreement. There is a significant lead time before a franchisee can be approved by Firehouse. While the Bankruptcy Code allows a Chapter 11 trustee to assume and assign executory contracts (such as franchise agreements), neither the Bankruptcy Court nor a liquidating Chapter 11 trustee may unilaterally modify such agreements. Firehouse supports current management and is likely to be adverse to any forced assumption and assignment of its franchise agreements. In addition, the wholesale marketing of multiple Firehouse franchise agreements is likely to exceed the market's absorption rate, further driving down the market value for the Debtor's franchises.

At the beginning of August, 2012, the Finley Group released its "Recovery Analysis" ("Report") as commissioned by the Committee. [A full copy will be provided upon request to Debtor's counsel and approval of the Committee] While the Report addressed many aspects of the business, including profitability, market comparisons, and financial projections, its Orderly Liquidation Analysis is most germane. Specifically, using a recovery range between zero to thirty percent (0%-30%) and taking into consideration market conditions, debts owing at the time of filing, and its own experiences in liquidating restaurant assets, the Report estimated a liquidation value of the Debtor's assets (including a seventh restaurant which has subsequently been sold) between $26,980 and $81,335. In light of the secured position of CIT, no recovery would be realized by any junior claimant.

Similarly, the Report analyzed the Debtor from the opposing perspective as a going concern or put differently, the value of a business if allowed to maintain operations. While paraphrasing, the Report laid out two (2) possible directions for a going concern: the current ownership stay in management to continue operations of the Reorganized Debtor versus independent management be installed to operate the stores. As a going concern with current ownership remaining in place to operate the stores, the Report appraised the value of the Debtor between $357,671 and $894,178. Such potential realization as a going concern clearly provides benefit to junior claimants and provides the same best opportunity for repayment of claims. That potential payout as a going concern is in stark contrast to the zero ($0) recovery in the Report's estimated liquidation, *supra*. Conversely, the Report forecasts new management taking over operations for a period of two (2) years, presumably to repair and rehabilitate the Debtor, wherein the stores would have a value between $763,093 and $2,066,527. The Debtor respectfully disagrees with the contention that new management can be seamlessly installed into the Debtor's operations without significant risk to claimants, employees, and the overall financial state of the business. First and foremost, every operator of the Firehouse franchise must enroll and complete

rigorous training conducted at the corporate level. Thereafter, enrollees must be approved by Firehouse corporate in order to ensure the brand operates at the highest levels of performance and quality.  Finally, common sense suggests that an unfamiliar management cannot simply be installed (as the Report suggests) and seamless run the Debtor's operations, much less increase profitability in a time span of a mere two (2) years to the extent that the business operations could sell for in excess of $2 million.  The alternative potential outcome is that no suitable replacement management could be found and the business would be forced to liquidate.  In support of this contention, Firehouse corporate has continuously endorsed the present management and its continued control over the Reorganized Debtor.

## IV. TERMS OF THE CHAPTER 11 PLAN

### A.      Definitions

For purposes of this Plan, the following terms shall have the following meaning, unless the context clearly requires otherwise. Any term defined in the Bankruptcy Code or Bankruptcy Rules and not otherwise defined in this section shall have the meaning set forth in the Bankruptcy Code or the Bankruptcy Rules.  The rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan.

4.1      <u>Administrative Expense Claim</u> means the right to payment constituting a cost or expense of administration of the Chapter 11 Case under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estate of the Debtor, any actual and necessary costs and expenses of operating the business of the Debtor, any costs and expenses of the Debtor in connection with the administration and implementation  of the Plan, any indebtedness or obligations incurred or assumed by the Debtor in  connection with the conduct of its business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Sections 330 or 503 of the Bankruptcy Code and any fees or charges assessed against the estate of the Debtor under 28 U.S.C. § 1930.

4.2      <u>Administrative Expense Claim Bar Date</u>. The last date set by the Bankruptcy Court pursuant to the Administrative Expense Claim Bar Date Order to file a request for payment of any Administrative Expense Claim that arose between the Petition Date and the Effective Date, except for any Professional Compensation and Reimbursement Claims, which must be filed in accordance with Section 5.8 of the Plan.

4.3      <u>N/A</u>

4.4      <u>Allowed</u> means, with reference to any Claim: (i) any Claim against the Debtor that has been listed by the Debtor in its Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with  Bankruptcy Rule 4009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed and as to which no timely objection is filed; (ii) any Claim allowed hereunder, (iii) any Claim which is not Disputed; (iv)

any Claim that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court or under the Plan; or (v) any Claim that, if Disputed, has been Allowed by Final Order; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest,  punitive damages or any fine or penalty on such Administrative Expense Claim or Allowed Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any claim which the Debtor may hold against the holder thereof, to the extent such claim may be set off pursuant to Section 553 of the Bankruptcy Code.

4.5     <u>Allowed Secured Claim</u>. An Allowed Claim which is also a Secured Claim.

4.6     <u>Allowed Unsecured Claim</u>. An Allowed Claim which is not secured by property of the Debtor, including Deficiency Claims.

4.7     <u>N/A</u>

4.8     <u>Avoidance Actions</u>. Any claims, rights and causes of action owned by the Debtor under applicable law and/or created in favor of a Debtor under the Code, including, but not limited to, all claims, rights, causes of action and remedies arising under Sections 542 through 553 of the Code.

4.9     <u>Ballot</u>. The form for voting on the Plan that will be distributed to holders of claims in Classes that are impaired under the Plan and entitled to vote under Section 1126 of the Bankruptcy Code.

4.10    <u>Bankruptcy Code</u>. The United States Bankruptcy Code, Title 11 of the United States Code, as enacted in 1978 and thereafter amended.

4.11    <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the Western District of North Carolina.

4.12    <u>Bar Date</u> shall mean: (i) December 15, 2011 with respect to a prepetition Claim against the Estate other than a Claim of a Governmental Unit; and (ii) March 25, 2012 with respect to a prepetition Claim of a Governmental Unit against the Estate. With respect to Claims arising after the Petition Date, including Administrative Expense Claims, Deficiency Claims and Rejection Damage Claims, the bar date is established by the Plan to be 45 days subsequent to the Confirmation Date or as set forth in Sections 5.8 or 10.3 of the Plan.

4.13    <u>Business Day</u> means any day other than a Saturday, Sunday, or any other day on which commercial banks in Charlotte, North Carolina, are required or authorized to close by law or executive order.

4.14    <u>Cash</u> means cash and cash equivalents, including, but not limited to, bank deposits,

wire transfers, checks, and readily marketable securities, instruments and legal tender of the United States, or instrumentalities thereof.

4.15   <u>Cash Flow Distribution Funds</u> means funds contributed by the Debtor into the Distribution Account in accordance with Section 8.2.

4.16   <u>Cash Flow Distribution Date</u> shall mean 15 days prior to each Distribution Date during the remaining Plan Period until all claims are paid in full.

4.17   <u>Causes of Action</u>. Any and all actions, causes of action (including those under the Bankruptcy Code), claims, demands, and liabilities, whether known or unknown, in law, equity or otherwise, held by the Debtor or the Debtor-in-Possession.

4.18   <u>Claim.</u> Any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, uncontested, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, contested, uncontested, secured, or unsecured.

4.19   <u>Collateral</u> means any property or interest in property of the estate of the Debtor subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

4.20   <u>Confirmation Date</u>. The date of entry by the Court of an order confirming the Plan at or after a hearing pursuant to 11 U.S.C. Section 1129.

4.21   <u>Confirmation Hearing</u>. The date set by the Court for a hearing pursuant to 11 U.S.C. Section 1129.

4.22   <u>Confirmation Order</u>. The order of the Court confirming the Plan.

4.23   <u>Contingent Claim</u> means any claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

4.24   <u>Creditors' Committee</u> means the Official Committee of Unsecured Creditors.

4.25   <u>Creditor Representative</u> means the person appointed by a majority vote of the Creditors Committee to act in that capacity post-confirmation for all purposes specified in the Plan.

4.25   <u>Court</u>. The United States Bankruptcy Court for the Western District of North Carolina.

4.27    Cure means the payment of Cash by the Debtor or the Reorganized Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an executory contract or unexpired lease of Debtor and to permit Debtor to assume that contract or lease under Section 365(a) of the Bankruptcy Code.

4.28    Debtor. Scotto Restaurant Group, LLC.

4.29    Deficiency Amount. The amount of a Deficiency Claim against the Debtor, which shall be equal to the amount by which the Claim exceeds the sum of (a) any set-off rights of the holder of such Claim against the Debtor under sections 506 and 553 of the Code plus (b) the greater of (i) the net proceeds realized from the disposition of the collateral securing such Claim or (ii) the value of the interest of the holder of the Claim in the Debtor's interest in the collateral securing such Claim, as determined by order of the Bankruptcy Court.

4.30    Deficiency Claim. A general unsecured claim of a creditor, having liquidated collateral, which asserts a Deficiency Amount.

4.31    Disputed Claim. Any Claim (a) that is scheduled by the Debtor as disputed, contingent, or unliquidated, or (b) proof of which has been filed with the Bankruptcy Court and with respect to which an objection to allowance, in whole or in part, has been or is filed prior to the final date provided under the Plan for the filing of such objections (or thereafter to an order of the Bankruptcy Court) and which objection has not been (i) withdrawn or settled, or (ii) determined by Final Order of the Bankruptcy Court.

4.32    Disputed Claim Amount means the amount set forth in the proof of claim relating to a Disputed Claim or, if an amount is estimated in respect of a Disputed Claim in accordance with Section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, the amount so estimated pursuant to an order of the Bankruptcy Court.

4.33    Disputed General Unsecured Claims Reserve means, in the event there exists any Disputed General Unsecured Claim at the time the Reorganized Debtor makes a distribution to holders of Allowed Claims, the Reorganized Debtor shall reserve Cash in an amount equal to the Pro Rata Share of the Cash Flow Distribution Funds that would have been payable to the Holder of the Disputed Claim should such claim subsequently become an Allowed Claim.

4.34    Distribution Date shall mean the last day of January and July of each year during the Plan Period, from 2013 until all Allowed Claims are paid in full.

4.35    Distribution Fund means the Cash to be paid by the Reorganized Debtor as provided in the Plan.

4.36    Effective Date shall mean the date which is 30 days after the Confirmation Date, or if such date is not a Business Day, the next succeeding Business Day; provided, however, that if, as of such date, all conditions precedent to the occurrence of the Effective Date set forth in Article XI of the Plan have not been satisfied or waived, then the  Effective Date shall be the first

Business Day immediately following the day upon which all such conditions have been satisfied or waived.

4.37    Equity or Equity Interest means the membership interest of Justin Scotto, his successors or assigns.

4.38    Final Order. An order entered by the Court which has not been reversed, stayed, modified or amended and as to which the time to appeal has expired.

4.40    Gap Claim a claim arising in the ordinary course of the Debtor's business after the August 11, 2011 filing of the case but before the September 27, 2011 entry of the Order for Relief.

4.41    General Unsecured Claim or Unsecured Claim means any Claim against the Debtor or its estate other than an Administrative Expense Claim, Secured Claim, Priority Claim, Priority Tax Claim, or Gap Claim (specifically excluding any claim arising by virtue of an ownership interest in the Debtor).

4.41a.  Guarantors means Justin & Stephanie Scotto.

4.42    Impaired means, when used with reference to a Claim or Equity Interest, that such Claim or Equity Interest is impaired within the meaning of Section 1124 of the Bankruptcy Code.

4.43    Lien has the meaning set forth in Section 101(37) of the Bankruptcy Code.

4.44    "Owner" means and refers to the holder of an Equity Interest; provided, however, that to the extent a Person forfeits its Equity Interest, it automatically shall cease to be an Owner.

4.45    "Owner Contributions" shall have the meaning set forth in Section 7.6 of this Plan.

4.46    Petition Date shall mean August 11, 2011.

4.47    Plan. This Plan of Reorganization, including any modifications or corrections.

4.48    "Plan Period" shall mean the period of time commencing on the Effective Date and ending on the final Distribution Date.

4.49    Priority Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under Section 507(a) of the Bankruptcy Code, but only to the extent entitled to such priority.

4.50    Priority Tax Claim means any Claim of a governmental unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

4.51    Professional means an Entity that is: (i) employed pursuant to a Final Order in accordance with Sections 327 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330 and 331 of the

Bankruptcy Code; or (ii) for which compensation has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

4.52    <u>Professional Fee Claim</u> means those fees and expenses claimed by Professionals pursuant to Sections 330, 331 and/or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

4.53    <u>Pro Rata Share</u> means a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the amount of all Allowed Claims in such Class.

4.54    <u>Quarterly Fees</u> means the sums that the Debtor is required to pay to the United States Bankruptcy Administrator pursuant to 28 U.S.C. § 1930(a)(6).

4.55    <u>Reorganized Debtor</u> means Scotto Restaurant Group, LLC on and after the Effective Date.

4.56    <u>Rejection Claim</u>. A claim, other than an administrative claim, arising  under Section 502(g) of the Bankruptcy Code as a result of the rejection of an executory contract or unexpired lease.

4.57    <u>Reorganized Debtor</u>. The Debtor after Substantial Consummation of the Plan, and as re-vested with properties of the estate as provided in Section 1141(b) of the Code.

4.58    <u>Schedules</u> shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

4.59    <u>Secured Claim</u>. Any claim secured by a right of setoff or a security interest  in property of the estate for which a timely proof of claim is filed, if not objected to on a timely basis, without regard to the operation of 11 USC Section 506.

4.60    <u>Substantial Consummation</u>. The Date on which the Reorganized Debtor has commenced distributions of payments to claimants under the Plan, subject to a determination of the Court.

4.61    <u>Tax Claim</u>. Any claim filed as unsecured and entitled to priority in treatment pursuant to 11 U.S.C. Section 507(a)(8).

## ARTICLE V
## TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS AND OTHER UNCLASSIFIED PRIORITY CLAIMS

5.1    <u>Non-Classification</u>. As provided in Section 1123(a)(1) of the Bankruptcy

14

Code, Administrative Expense Claims and Unclassified Priority Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan. All such Claims are instead treated separately in accordance with the terms in this Article.

5.2     Administrative Expense Claims. Administrative Expense claims consist of all Allowed Claims against the Debtor under section 503(b) of the Bankruptcy Code and any fees and charges assessed against the Debtor's estate under section 1930 of Title 28 of the United States Code, to the extent that the same are entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code. Administrative Expense Claims are estimated to total $100,000.00 to $150,000.00. Allowed administrative expense claimants will be paid in accordance to §1129 (a)(9)(A) or have agreed to alternative terms as follows:

5.2.1   The Henderson Law Firm ("Henderson"). Henderson has agreed for its 503(b) claims to be paid in full by the Debtor, in cash, from the Distribution Fund prior to payment of any Claims other than Allowed Secured Claims. Such claims shall be paid pro rata with the other allowed Administrative Expense Claims based on the cash available in the Distribution Fund on the Distribution Dates.

5.2.2   Parker Poe Adams & Bernstein LLP ("Parker Poe"). Parker Poe has agreed for its  503(b) claims to be paid in full by the Debtor, in cash, from the Distribution Fund prior to payment of any Claims other than Allowed Secured Claims. Such claims shall be paid pro rata with the other allowed Administrative Expense Claims based on the cash available in the Distribution Fund on the Distribution Dates.

5.2.3   Justin Scotto ("Scotto"). Scotto has agreed to waive his 503(b) claim in consideration of the provisions stated in Section 14.6.

5.2.4   The Finley Group ("Finley"). Finley has previously been appointed as an examiner pursuant to 11 U.S.C. § 1104(c). Any approved fee applications will be deemed an administrative expense claim and will be paid in full by the Debtor, in cash, from the Distribution Fund prior to payment of any Claims other than Allowed Secured Claims. Such claims shall be paid pro rata with the other allowed Administrative Expense Claims based on the cash available in the Distribution Fund on the Distribution Dates.

5.2.5   Ed Lloyd & Associates. Ed Lloyd and Associates has agreed for its 503(b) claims to be paid in full by the Debtor, in cash, from the Distribution Fund prior to payment of any Claims other than Allowed Secured Claims. Such claims shall be paid pro rata with the other allowed Administrative Expense Claims based on the cash available in the Distribution Fund on the Distribution Dates.

5.2.6   Any other Administrative Expenses Claim. Any additional allowed Administrative Expense Claims timely filed and approved pursuant to Section 5.8, supra, will have the same treatment as above, specifically, the holders' 503(b) claims shall be paid pro rata with the other allowed Administrative Expense Claims based on the cash available in the Distribution Fund on the Distribution Dates.

To the extent that any person advances (or has advanced) funds to any court-approved professional in payment of allowed Administrative Expense Claims, such individual shall be subrogated (under common law principles and by virtue of this Plan) to that professional's right to receive payment in accordance with this provision to the extent of the advance; provided, however, that such right of subrogation shall be enforceable only after such professional has received payment through this Plan of all allowed Administrative Expense Claims less the amount of any advance(s) received.

5.3    Gap Claims.  The holders of Allowed Gap Claims, if any, will be paid in cash equal to the allowed amount of their claim on the Effective Date or as soon thereafter as is practicable, unless the holder of the claim agrees to different treatment. Holders of such claims are presumed to accept this Plan and the votes of those holders will not be solicited.

5.4    Priority Tax Claims. Priority Tax Claims consist of all Allowed Claims of governmental units against the Debtor entitled to priority under section 507(a)(8) of the Bankruptcy Code, except tax penalty claims.  These claims are impaired.  These claims will be paid in even installments from the Distribution Fund on a semi-annual basis, with interest at the applicable rate, commencing on the first Distribution Date.  Payments will continue for a maximum of four (4) years after the date such claims were assessed, in compliance with section 1129(a)(9)(C) of the Bankruptcy Code. The Debtor will make semi-annual distributions to the holders of Priority Tax Claims before determining the pro rata distribution to the holders of general unsecured claims.

5.5    N/A

5.6    Semi-Annual Distributions. As described in sections 8.2, 8.3 and 8.4 below, the proceeds on deposit in the Distribution Account will be disbursed semi-annually on the Distribution Dates. The Allowed Priority Tax Claims shall be paid, pro rata, from the Distribution Account after the payment in full of all Allowed Administrative Expense Claims.

5.7    United States Trustee/Bankruptcy Administrator Fees.  All fees required to be paid by 28 U.S.C. §1930(a)(6) (U.S. Bankruptcy Administrator Fees) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code.  Any U.S. Bankruptcy Administrator Fees owed on or before the effective date of this Plan will be paid on the effective date. Any fees accrued thereafter will be paid from the Distribution Fund.

5.8    Professional Compensation and Expense Reimbursement Claims.

5.8.1    Each Professional, excluding Debtor's counsel, Creditor's Committee counsel and the Finley Group, shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date within thirty (30) days after the Effective Date. Any award granted by the Bankruptcy Court shall be paid upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Debtor.

5.8.2    All fees and expenses of Professionals for services rendered after the Effective Date in connection with the Bankruptcy Case and the Plan shall be paid by the Debtor upon receipt of reasonably detailed invoices therefor in such amounts and on such terms as such Professional and the Debtor may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

## ARTICLE VI
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

6.1    <u>Claims Provided for in the Plan</u>. This Plan treats all Claims against the Debtor, against the Debtor's Property and against the Estate. Only Allowed Claims receive any distribution under this Plan. All other Claims are disallowed by the Plan and will not receive any distributions under the Plan.

6.2    <u>Limitation on Inclusion in a Class</u>. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that class. A Claim is in a particular Class only to the extent that the portion of the Claim is an Allowed Claim in that class.

6.3    Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 - Secured Claim of CIT Small Business Lending Corporation | Impaired | Each holder of a Class 1 shall be paid in full, first from the proceeds of any store sold by the Debtor by virtue of its secured claim (see section 6.7, *infra*).  CIT agrees to a monthly payment of $4000.00 payable on the 15th of each month, which represents an advanced amortized payment carrying interest at the contract rate and contract terms, but is expected to be paid off entirely within one (1) year after the Effective Date and if not, a balloon payment shall be due at the end of such period.  CIT shall retain post-petition liens described under the loan documents governing the CIT Claim and which are described in the financing statement filed with the North Carolina Secretary of State ("NCSOS"); upon payment in full of the CIT Allowed Secured Claim, CIT will file a termination of the financing statement(s) filed with the |

| | | |
|---|---|---|
| | | NCSOS. |
| Class 2 – American Honda Finance | Unimpaired | The Allowed Secured Claim of Honda, together with interest thereon at the rate set forth in the applicable loan documents, shall be paid in full. The Debtor shall pay Honda in even monthly installments commencing on the 15th calendar day of the first month following the Confirmation Date and continuing each month thereafter for a period of three (3) years. At any time, the Debtor may pre-pay (in whole or in part) the Honda Claim. |
| Class 3 - General Unsecured Creditors | Impaired | The Allowed Claims in Class 3 shall be paid, pro rata, from the Excess Profits, as defined in Article 8 herein until paid in full, after the payment of all Administrative Expense Claims and Allowed Priority Claims, in semi-annual distributions from the Distribution Account. The holders of Class 3 Claims shall first be paid up to the Allowed amounts of their respective Claims, and then, to the extent there are sufficient funds in the Distribution Account to do so, shall receive interest on the Allowed amounts of their Claims at the Wall Street Journal Prime Rate from and set at the Effective Date until the Allowed amount and all interest is paid in full to be distributed by Debtor or Debtor's Counsel. |
| Classes 4- Contingent Claims [Debtor is unaware of any such claims] | Impaired | In order to participate in distribution under this Plan, such holders must file a proof of claim by no later than the Effective Date. If no proof of claim is timely filed, there will be no distribution on such claim and the claim will be discharged. No distributions will be made on such claims until i) the occurrence of the final event giving rise to |

| | | |
|---|---|---|
| | | the Debtor's alleged liability and ii) within no more than 90 days subsequent to such final event, the holder must seek the estimation of the claim by motion filed with the Court, in accordance with the Bankruptcy Rules.  In the event a Contingent Claim becomes an Allowed Claim, the Contingent Claim will be paid the same dividend as that received by Class 3 general unsecured creditors. |
| Class 5 - Equity Security Holders of the Debtor | Impaired; non-voting | Each holder of a Class 5 interest will retain their interests in the Debtor, but all interests shall be subordinated until all Plan Payments are made. See below. |

6.4  Sale of Store(s).  The Court previously approved an Offer to Purchase ("Sale") one of the Debtor's store locations (referenced as the "Dale Earnhardt" store) for a gross purchase price of one-hundred sixty thousand dollars ($160,000).  That sale closed and the net sale proceeds were paid to CIT in partial satisfaction of its secured claim.  The particulars of the Sale are included in the Court's Order Approving the Sale of  Property Free and Clear of Liens pursuant to 11 USC §363. [See Dkt Rpt: #171].

The Debtor will retain the right to place other stores on the market for sale in order to satisfy remaining claims, subject to the following requirements: (a) the Debtor must consult with the Creditor Representative in advance of making any verbal or written offers to sell or soliciting any verbal or written offers to purchase; and (b) before selling any stores, the Debtor must obtain either (i) the written consent of the Creditor Representative, or (ii) approval of the Bankruptcy Court after notice and a hearing.  The net proceeds of any sale will be distributed in accordance with the terms of this Plan.

6.5  Equity Interests. Class 5, *supra*, consists of the equity interests in the Debtor, now or in the future.

6.5.1  Impairment. Class 5 is impaired under the Plan.

6.5.2  Retention or Forfeiture of Interests upon Failure to Pay Owner Contributions. The existing membership interests will survive Confirmation and will continue to be owned by Mr. Scotto (or any assignee thereof) who shall continue to represent the equity ownership of the Debtor. This treatment is without limitation as to any right to receive any payments, distributions or other valuable consideration as a result of any Claim held by such parties

19

included in some other Class subject to allowance by the Court.

6.5.3   In order to retain their rights and interest as a member of the Reorganized Debtor, each Owner must comply with all of its obligations under the Plan. If an Owner fails to comply with its obligations under the Plan, it shall forfeit its Equity Interest in the Reorganized Debtor and the unpaid creditors shall each have an opportunity to bid on the Equity Interest. See also Section 6.6, infra.

6.5.4   Distributions. Subject to the provisions of section 6.5.3, each record holder of Equity Interest in the Debtor shall retain its interest in the Debtor. During the Plan Period, the Debtor shall not make equity distributions to the holders of Equity Interests, provided, however, that the Debtor shall reimburse such holder(s) for any income taxes that the Owner is legally required to pay based on income of the Reorganized Debtor (subject to the requirements of section 6.6).

6.5.5   S c o t t o   A d j u s t e d   C o m p e n s a t i o n .   Beginning on the Effective Date, Scotto shall receive an annual salary of $88,000.00 for his services as manager of the Reorganized Debtor.  Such salary shall be subject to a cost-of-living adjustment of 3% per annum during the life of the Plan.  In addition, Scotto shall be entitled to receive an annual cash bonus, payable on January 1st of each year, equal to (1) 6% of any cash actually distributed during the prior calendar year on Allowed Secured Claims, Allowed Administrative Expenses, Allowed Priority Tax Claims, and Allowed Gap Claims, plus (2) 10% of any cash actually distributed during the prior calendar year on Allowed Unsecured Claims.

6.6.   Contribution and the Absolute Priority Rule.

The "absolute priority" rule shall be satisfied by a 100% payment to all general unsecured creditors holding an allowed claim by the Debtor on a yearly basis with applicable interest rate consideration if possible and as more specifically addressed above.  The Reorganized Debtor has agreed to continue the proposed 9 year payout with semi-annual extensions until creditors are paid in full, thus satisfying the "absolute priority" rule. As additional consideration for the retention of the Equity Interest, and to the extent 100% payment has not been made to all general unsecured creditors holding allowed claims, Justin Scotto agrees that the Debtor shall not be required to make, and shall not make, any distributions to him for the purpose of paying taxes based on income of the Debtor (nor shall the Debtor pay any such taxes directly on Justin Scotto's behalf) unless and until Justin Scotto has used up all personal carry over losses to which he may be legally entitled.

The hearing on the confirmation of the Plan shall constitute an opportunity for any creditor, party-in-interest or other entity to submit a competing bid for the equity interest in the Debtor. All competing bids shall be filed with the court and served upon the United States Bankruptcy Administrator, the Debtor and counsel for the Debtor at least ten (10) days prior to the date set for the hearing on Plan confirmation, as scheduled by the Court. Additionally, the Debtor's exclusivity period under the § 1121 has expired. Therefore, any party in interest is free to propose an alternate plan of reorganization and equity re-distribution, thereby satisfying *Bank of America Nat'l Trust and Sav. Assoc. v. 203 N. Lasalle P'ship*, 526 U.S. 434 (1999).

6.7     Disputed Claims. Notwithstanding any other provision of this Plan, no cash or property shall be distributed under the Plan on account of any Disputed Claim until the Claim is Allowed. The Reorganized Debtor shall establish a reserve ("Disputed Claims Reserve") with respect to Disputed Claims. Cash to be distributed on account of Disputed Claims shall be held by the Debtor until such Claims are Allowed or disallowed by Final Order. At the option of the Reorganized Debtor, Cash which is held in the Disputed Claim Reserve may be held in the Distribution Account or deposited into one or more segregated, interest bearing bank accounts that satisfy the requirements of 11 U.S.C. § 345. Upon the later of the Distribution Date or thirty (30) days after a Disputed Claim becomes Allowed, the holder shall receive a distribution from the Disputed Claims Reserve, based upon the Allowed amount of the Claim, plus a proportionate amount of any interest earned thereon, and, thereafter, shall participate in any further distributions under the Plan as the holder of an Allowed Claim. Any cash or property remaining in the Disputed Claims Reserve after the resolution of all disputes by Final Order shall be distributed in accordance with the Plan.

6.8     No Penalties. Except as expressly stated in the Plan or allowed by the Bankruptcy Court, no penalty or late charge shall be allowed on any Claim subsequent to the Petition Date.

## ARTICLE VII
## MEANS FOR EXECUTION OF THE PLAN

7.1     Revesting of Property. Except as otherwise provided in this Plan, the Reorganized Debtor, as of the Effective Date, shall be vested with all of the assets of the Estate.

7.2     Avoidance Actions and Other Claims. Without limiting the foregoing, the Reorganized Debtor shall be vested with all claims and causes of action of the Debtor including, without limitation, those claims arising under sections 510, 541, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.  The Creditors Committee shall have a concurrent and coextensive right to pursue any such claims against Chris M. Scotto, Justin Scotto, and/or Stephanie Scotto, and The Finley Group shall be allowed to investigate the same at the Creditors Committee's election.  Any fees and costs expended by the Committee or The Finley Group in this effort arising after confirmation shall be paid first from any proceeds recovered by such actions as an administrative expense claim, but should no recovery be realized from such actions, the administrative expense claim incurred shall reduce the total Class 3 distributions in the same amount incurred and paid.

7.3     Bankruptcy Case Administration. Except as otherwise provided in this Plan, from and after the Effective Date and continuing through the date on which a final decree closing the Bankruptcy Case is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Reorganized Debtor shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Bankruptcy Case. In addition to the foregoing, for all matters arising under or related to the Bankruptcy Case, the Reorganized Debtor shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction, (ii) be entitled to notice and opportunity for hearing, (iii) participate in all matters brought before the Bankruptcy Court, including but not limited to adversary proceedings, and (iv) receive notice of all applications,

motions and other papers and pleadings before the Bankruptcy Court.

7.4 <u>Continuation of Business Operations</u>. From and after the Effective Date of the Plan, the Reorganized Debtor is authorized to continue its normal business operations and enter into such transactions as it deems advisable in its reasonable business judgment, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan.

7.5 <u>Continuation of Anti-Discrimination Provisions of Bankruptcy Code</u>. A governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Debtor, the Reorganized Debtor, or another Person with whom the Debtor or the Reorganized Debtor have been or are associated or affiliated, solely because of the commencement, continuation, or termination of the Bankruptcy Case or because of any provision of the Plan or the legal effect of the Plan, and the Confirmation Order will constitute an express injunction against any such discriminatory treatment by a governmental unit.

## ARTICLE VIII
## IMPLEMENTATION OF THE PLAN

8.1 <u>Financial Oversight by Firehouse</u>. The Reorganized Debtor will employ Firehouse of America to oversee the Debtor's bookkeeping for a term of 6 monthly accounting periods (the "Firehouse Oversight Period") at a cost of $600 per month per store. These costs will be paid by the Reorganized Debtor, and one-half of the cost shall be a credit against Class 3 claims and distributions thereto in the same amount paid by the Reorganized Debtor. Due to the administrative efforts to hire, train, and otherwise set up this financial oversight, Firehouse has indicated it can start such Financial oversight on December 31, 2012, the beginning of Fiscal year 2013. Firehouse will be responsible for:

8.1.1 Comparing the in-store registry (point of sale) systems at each store and tracking sales, cash receipts, inventory, discounts, product waste, sales tax and other variables against the period end financials. Monthly state sales tax returns will be produced and filed (based on state guidelines) by Firehouse.

8.1.2 Processing all invoices in the ordinary course of business (except payroll, which shall be handled in accordance with Section 8.1.6 below), and preparing checks to be delivered to the Reorganized Debtor for signature and delivery to the appropriate persons;

8.1.3 Ensuring that all cash from all stores is deposited and reconciled on a period basis;

8.1.3a Reconciling the Reorganized Debtor's financial records against its online bank account balances on a monthly basis;

8.1.4    Producing detailed periodic financial reports (including a balance sheet and P&L statement in the same level of detail, and containing the same expenses categories, as <u>Exhibit B</u> attached), on both an enterprise and store level basis, which shall include a narrative explaining any deviations from historical performance or typical Firehouse restaurant performance and any other unusual factors contributing to higher or lower revenue or expenses (the "Firehouse Financials");

8.1.5    Delivering copies of the Firehouse Financials to the Reorganized Debtor and the Creditor Representative within twelve (12) business days following the end of every reporting period; and

8.1.6    Causing the Reorganized Debtor's payroll to be administered by an independent payroll service provider designated by the Reorganized Debtor, including the payment of the wages and salary for insiders and Justin Scotto. The Reorganized Debtor will report all payroll figures to the designated payroll service for processing and payroll related reports in conformity with this section. Reorganized Debtor will further supply the payroll invoice to Firehouse, to be processed in the normal course of business.

8.1.7    Reorganized Debtor will comply with Firehouse's financial deadlines in order to process the financial reports accurately and timely. These daily and weekly deadlines will be supplied to Reorganized Debtor four weeks prior to oversight start date. Reorganized Debtor will be required to sign a scope of work and liability waiver engagement letter prior to oversight start date from Firehouse of America.

8.1a    <u>Continuation of Financial Oversight</u>. The financial oversight of the Reorganized Debtor shall be extended for consecutive additional 6 month periods (each such period being referred to as an "Extended Oversight Period") unless, within 30 days prior to the end of the Firehouse Oversight Period (or, if previously extended, the then-current Extended Oversight Period), unsecured creditors (other than insiders) that hold at least two-thirds in amount and more than one-half in number of the allowed but unpaid unsecured claims shall make a written election to terminate the financial oversight.  During the Extended Oversight Period(s), Ed Lloyd & Associates, an independent CPA firm, shall take over the same tasks and duties as specified in section 8.1 at a base cost of $500 plus $425 per store per month,  which costs will be paid by the Reorganized Debtor.  For the duration the first Extended Oversight Period and any additional Extended Oversight Periods through and including December 31, 2015, one-half of these costs shall be a credit against Class 3 claims and distributions thereto in the same amount paid by the Reorganized Debtor.  Thereafter, 100% of these costs shall be a credit against Class 3 claims and distributions thereto in the same amount paid by the Reorganized Debtor.

If Ed Lloyd & Associates should become unable or unwilling to perform this function, then the Reorganized Debtor and the creditors shall confer in good faith and designate another

qualified person or firm to perform this function, with any dispute regarding same being resolved by the Bankruptcy Court after notice to all interested parties and a hearing.

Firehouse has agreed to (1) review the periodic reports produced by Ed Lloyd and Associates (or any alternative person or firm designated pursuant to the foregoing paragraph) pursuant to section 8.1.4 above to ensure that they are consistent with (a) GAAP (Generally Accepted Accounting Principles), and (b) the in-store registry (point of sale) systems at each store (which Firehouse has direct access to); and (2) report any material out of the normal scope variances to the Reorganized Debtor and the Creditor Representative. Such reviews shall take place at the following intervals:

- monthly during the first Extended Oversight Period; and

- bi-monthly during the second Extended Oversight Period.

All of Firehouse's obligations under this section shall terminate after the second Extended Oversight Period.

At the conclusion of the Firehouse Oversight Period and any applicable Extended Oversight Periods, the Reorganized Debtor shall resume the bookkeeping function and the other financial responsibilities enumerated above. Thereafter, for the duration of the Plan, the Reorganized Debtor will be required to (1) operate strictly within the parameters of GAAP, (2) prepare its financial reports using the same expense categories and level of detail as utilized by Firehouse during the Firehouse Oversight Period, and (3) perform all of the functions to be performed by Firehouse during the Firehouse Oversight Period and by Ed Lloyd & Associates during any Extended Oversight Periods as specified in sections 8.1.1 through 8.1.5 above.

At any time during the Plan Period, the Creditor Representative, in an individual capacity or upon request of any creditor or group of creditors, may have a full or partial audit of the Reorganized Debtor's financial records performed by an outside CPA of the requesting creditors' choosing. The Creditor Representative may request no more than 2 audits, full or partial, in any calendar year. The Reorganized Debtor shall cooperate fully in connection with any such audit. The cost of any such audit shall be borne by the requesting creditor(s); provided, however, that if any such audit turns up any discrepancies in favor of the creditors by a variance of over five percent (5%) of Net Income, then the claim(s) of the requesting creditor(s) shall be increased by the lesser of (1) the total amount of any such discrepancies, or (2) the cost of the audit.

8.1b    Restricted Transactions. During the Plan Period, the Reorganized Debtor shall not be permitted to (a) sell any existing stores or buy any new stores; (b) borrow any money (other than incurring ordinary trade credit extended by its vendors and service providers in the ordinary course of business); (c) buy any motor vehicles; or (d) buy any equipment or other assets in excess of (i) $5,000 individually, or (ii) or $50,000 in the aggregate over the course of a calendar year, without the prior written consent of the Creditor Representative or approval from the Bankruptcy Court after 20 days' written notice to all interested parties and a hearing. Otherwise, the Reorganized Debtor shall be authorized to manage its business affairs according to its own

reasonable business judgment without interference from the creditors or the Creditor Representative, subject to the requirements of this Plan.

If the Reorganized Debtor requests the consent of the Creditor Representative to buy a motor vehicle and the Creditor Representative refuses to consent, and thereafter the Bankruptcy Court enters an order approving the requested motor vehicle purchase over the Creditor Representative's objection, all fees and expenses incurred by Reorganized Debtor in connection with obtaining Bankruptcy Court approval shall be paid by the Creditor Representative.

8.2    <u>Establishment of the Distribution Account</u>. No later than 20 days after the Effective Date, the Debtor shall establish an account at an FDIC insured financial institution into which it shall deposit, when required pursuant to the terms of this Plan, Excess Profits (if any) and the Minimum Distribution Amount (the "Distribution Account").

8.2    <u>Deposits into the Distribution Account</u>.

8.2.1 Excess Profits.

8.2.1.1 Preparation of Budget. No later than fifteen (15) calendar days prior to each Distribution Date, the Debtor shall prepare a cash budget for the six months following the Distribution Date (the "6-Month Budget"). For the initial Distribution Date, the budget shall be presumed to be stated in Exhibits "A" and "B" attached hereto. The 6-Month Budget shall analyze expected cash receipts and cash disbursements on a monthly basis. Any creditor or party-in-interest may request a copy of the 6-Month Budget for any particular 6-month period by providing a written request to the Debtor during the two-week period preceding the Debtor's deadline to prepare the 6-Month Budget. If such a request is timely received, the Debtor shall transmit the 6-Month Budget to requesting Persons by e-mail no later than 15 days prior to the Distribution Date. Any requesting claimant will bear the costs associated with the production of the 6 Month Budget.

8.2.1.2 Cash Reserve. The Reorganized Debtor shall maintain a cash reserve to cover any unanticipated cash shortfalls in future months (the "Cash Reserve Amount"). In consultation with Firehouse, the Debtor believes that it will need a Cash Reserve Amount at all times in an amount of $25,000 for the current year and years 1-2, $30,000 in years 3-5, and $35,000 in years 6-8 of the proposed Plan payments if needed. This Cash Reserve Amount will provide cushion for irregular business expenses including, but not limited to, equipment replacement costs greater than $500, Franchise Renewal fees of $5000/store, weather-related work stoppage and unforeseen leasehold repairs, but excluding ordinary operating expenses as revealed in Exhibits "A" and "B". The Cash Reserve Amount is not annually aggregate or cumulating, but will be replenished by net income as need be to ensure the requisite "cushion" is always available.

The Reorganized Debtor shall notify the Creditor Representative within 5 days should the Cash Reserve Amount fall below the foregoing thresholds at any time during the Plan Period.

8.2.1.3 Determination of Excess Profits; Transfer to Distribution Account. As of the date which is fifteen (15) calendar days prior to each Distribution Date, the Debtor shall transfer to the Distribution Account an amount equal to (a) its Cash on hand (excluding any funds already on deposit in the Distribution Account) less (b) the Cash Reserve Amount (the "Excess Profits").

8.2.1.4 Objections to 6-Month Budget. Any objections to the 6-Month Budget must be made in writing to the Debtor and counsel for the Debtor no later than seven calendar days prior to a Distribution Date. In the event a timely objection is filed, the Debtor and the objecting party shall attempt to resolve the objection informally. If the objection cannot be resolved informally, the objection will be resolved by the Bankruptcy Court.

8.2.2 Recoveries from Avoidance Actions and Other Claims. The Debtor may obtain recoveries on account of pre-petition and/or bankruptcy claims and causes of action of the Debtor including, without limitation, claims arising under sections 510, 541, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code. The Debtor will deposit any recoveries on account of such claims (net of attorneys' fees, costs and other expenses incurred in the pursuit of such recoveries) into the Distribution Account. Pursuant to paragraph 7.2, the Creditors' Committee shall have the right to pursue such claims and causes of action against Chris M. Scotto, Justin Scotto, and Stephanie Scotto and any recoveries shall be deposited as stated herein. Any fees and costs expended by the Committee or The Finley Group in this effort arising after confirmation shall be paid first from any proceeds recovered by such actions as an administrative expense claim, but should no recovery be realized from such actions, the administrative expense claim incurred shall reduce the total Class 3 distributions in the same amount incurred and paid.

8.3 <u>Distributions from the Distribution Account</u>. On each Distribution Date, the Debtor shall pay all cash on deposit in the Distribution Account (less such amount as the applicable financial institution may require as a minimum balance) according to the following priorities: (a) first, to the holders of Allowed Administrative Claims not previously paid, pro rata; (b) second, to the holders of Allowed Priority Tax Claims not previously paid, up to the Allowed amount of such holders' Claims, pro rata; (c) third, to the holders of Claims in Class 3, pro rata, up to the Allowed amount of such holders' Claims; and (d) only after payment in full of all of the foregoing, to then current Owners in amounts corresponding to their then applicable Equity Interests.

8.3a   <u>Distributions from the Sale of Stores</u>.  All net proceeds from the sale of any stores shall be distributed as soon as practicable after the sale closes according to the priorities set forth

in section 8.3 above.

    8.4    <u>Method of Distributions under the Plan</u>.

        8.4.1   In General. Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by the Debtor to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules as of the Effective Date, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules or is represented by counsel. The Debtor shall have no obligation to locate holders whose distributions or notices are properly mailed but nevertheless returned. Distributions may be made under this Plan through payments directly from the Debtor.

        8.4.2   Form of Distributions. Any payment of Cash made by the Debtor pursuant to the Plan shall be made by regular check; provided, however, that after the occurrence of the Effective Date, the Debtor is not obligated to make any Cash payment under the Plan unless the payment exceeds ten dollars ($10); provided, further, that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was less than or equal to ten dollars ($10) shall be maintained in a reserve (the "Small Payment Reserve") for the benefit of such holder until an aggregate of at least ten dollars is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled.

        8.4.3   Distributions to be on Business Days. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

        8.4.4   Withholding Taxes on Distributions. The Reorganized Debtor shall withhold from any Cash or property distributed under the Plan such amounts as the Debtor's members are obligated under non-bankruptcy law to withhold and transmit to taxing authorities arising from the Reorganized Debtor's operations. Justin Scotto, or his successor or assigns, will agree to release the Debtor from the obligation to withhold such taxes until such time as Justin Scotto has used up all personal carry over losses to which he may be legally entitled. Thereafter, any member may notify the Debtor that his/her release is revoked and the Debtor will operate in conformity with the provisions herein. The Debtor estimates the amount required to be withheld under this section to be approximately twenty-five percent (25%) of the Deposits into the Distribution Account, supra.

    8.5    <u>Objections to Disputed Claims</u>. Any objections to Claims against the Estate may be prosecuted by the Reorganized Debtor, the Creditors' Committee, or any other party in interest with approval from the Reorganized Debtor or the Bankruptcy Court. Except as otherwise

provided by order of the Bankruptcy Court, the Reorganized Debtor, the Creditors' Committee, or any other party in interest (with the permission of the Reorganized Debtor or the Bankruptcy Court) may file an objection to any Claim until 180 days after the Effective Date. Upon motion filed within such one hundred eighty (180) days, the Bankruptcy Court may extend the period within  which to object to a Claim for a reasonable period of time, not to exceed an additional one hundred eighty (180) days. Any Claim to which no timely objection has been filed shall be deemed an Allowed Claim.

8.6     <u>Estimation of Claims</u>. The Debtor or the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim. The Debtor and the Reorganized Debtor shall be entitled to request that the Bankruptcy Court determine either the Allowed amount of such Claim or a maximum limitation on such Claim. If the Bankruptcy Court determines the maximum limitation of such Claim, such determination shall not preclude the Debtor or Reorganized Debtor from pursuing any additional proceedings to object to any ultimate payment of such Claim. If the Bankruptcy Court determines the Allowed amount of such Claim, the amount so determined shall be deemed the amount of the Disputed Claim for all purposes under this Plan. All such proceedings are cumulative and not exclusive remedies.

8.7     <u>Cash Payments and Time Bar</u>. The holders of Allowed Claims are responsible for providing the Reorganized Debtor with the holder's current mailing address for purposes of receiving distributions under the Plan. Cash distributions made by the Reorganized Debtor shall be by checks drawn on a domestic bank, and promptly mailed, postage prepaid. Any check issued to pay an Allowed Claim will be null and void if such check is not negotiated within ninety (90) days of its issuance, and all rights to such distribution by such Creditor shall be forfeited. The Reorganized Debtor will retain the funds resulting from such void checks in the Distribution Account, which funds shall be used to make future distributions to creditors under the Plan.

8.9     <u>Retention and Preservation of Claim Objections and Causes of Action</u>. Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, upon entry of the Confirmation Order, the Debtor and the Reorganized Debtor's rights to object to all Claims and Interests asserted against the Estate and all of the Debtor's or Estate's Causes of Action, including without limitation: (1) the Debtor's Causes of Action asserted in any adversary proceeding, state court proceeding, or any other proceeding which is pending as of the Confirmation Date; (2) all Claims and Causes of Action disclosed in the Schedules which are incorporated herein by reference; (3) all Claims and Causes of Action described in the Disclosure Statement; (4) any Claims and Causes of Action contained in any contested matter or objection to Claim pending on the Confirmation Date; and (5) any and all other Claims and Causes of Action that the Debtor holds pre-confirmation shall vest in the Estate. Notwithstanding anything else in the Plan to the contrary, no provision in this Plan is intended or shall be construed to preclude or otherwise bar the Debtor from pursuing any claims arising under chapter 5 of the Bankruptcy Code or under other applicable law. Among other things, no Person sued pursuant to sections 547, 548, 549, 550, 553 of the Bankruptcy Code or otherwise may argue that confirmation of this Plan precludes such claim on grounds of res judicata, issue preclusion or otherwise.

8.10 <u>No Release or Waiver</u>. Unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Debtor expressly reserves such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of Action not specifically identified or which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts and circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Causes of Action have been expressly released in the Plan or any other Final Order of the Bankruptcy Court.

## ARTICLE IX
## VOTING ON THE PLAN

9.1    <u>Voting of Claims</u>. Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

9.2    <u>Non-consensual Confirmation</u>. If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtor reserves the right (i) to confirm the Plan under Section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan in accordance with Section 11.6 hereof to the extent necessary to obtain entry of a Confirmation Order.

## ARTICLE X
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

10.1    <u>Assumption of Executory Contracts and Leases</u>. Assumed executory contracts and leases (collectively, the "Assumed Contracts") will be assumed pursuant to section 365 of the Bankruptcy Code in accordance with their terms, unless (a) alternative terms are agreed to by the non-Debtor party or parties to such Assumed Contracts, (b) alternative terms are specified in the Plan. Unless such assumption is authorized prior to the Confirmation Date, within seven days prior to the Confirmation Date, the Debtor shall file a Supplement to the Plan (the "Plan Supplement") which shall list all Assumed Contracts. The Debtor anticipates assuming all executory contracts and unexpired leases pursuant to the terms of each and as Ordered by the Court, with the following distinctions:

10.1.1.    <u>Epicentre Store Lease</u>. As of the Petition Date, Debtor believes it to have arrears owing on this Lease to MV Epicentre II, LLC in the approximate amount of ten-thousand dollars ($10,000). With the consent of MV Epicentre II, LLC through the confirmation

of the Debtor's plan, Debtor will assume the lease with MV Epicentre II, LLC for the Epicentre store location, but will have the opportunity to repay the arrears amount over a period of thirty-six (36) months beginning on the Effective Date.

10.2    Rejection of Executory Contracts. Except for the Assumed Contracts, any and all Executory Contracts and unexpired leases that have not been either assumed or rejected prior to the Effective Date are rejected by the Debtor (the "Rejected Contracts"), and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

10.3    Rejection Damage Claims. If the rejection of an executory contract or unexpired lease by the Debtor pursuant to Section 10.2 hereof results in a claim for damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, or its respective properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before forty-five (45) days following the Confirmation Date. Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as General Unsecured Claims subject to the provisions of the Plan. The Debtor shall have the right to object to any such rejection damage claims filed in accordance with this Section.

10.4    Post-Petition Agreements Unaffected By Plan. Except as otherwise expressly provided herein, nothing contained in the Plan shall alter, amend or supersede any agreements or contracts entered into by the Debtor after the Petition Date that were otherwise valid, effective and enforceable against the Debtor as of the Confirmation Date. The Reorganized Debtor shall be deemed to be substituted for any Debtor in such contract or agreement, as applicable, and the Reorganized Debtor shall have all right, title and interest of the Debtor under such contract or agreement as if the Reorganized Debtor had been the original contracting party thereunder.

10.5    Cure Payments. The amount of the proposed cure payment, if any, that may be required for the assumption of any Assumed Contracts shall be identified in the Plan Supplement (the "Proposed Cure Amount"). Any dispute regarding (i) the Proposed Cure Amount for any Assumed Contract or (ii) any other matter pertaining to assumption or assumption and assignment under Section 365 of the Code (a "Disputed Assumption") shall be forever barred and shall not be enforceable unless a motion or objection, as appropriate, is filed and served on the Debtors no later than three (3) Business Days before the date first set for the Confirmation Hearing. Any such motion or objection shall be heard concurrently with the Confirmation Hearing, and the Debtor shall have the right (i) to dispute any cure amounts or other obligations asserted with respect to any Disputed Assumption and (ii) to negotiate and settle any Disputed Assumption, subject to approval by the Court.

## ARTICLE XI
## CONDITIONS PRECEDENT TO EFFECTIVE DATE

11.1    Conditions Precedent to Effectiveness. The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been

30

satisfied or waived:

11.1.1  The Confirmation Order, in form and substance reasonably acceptable to the Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

11.1.2  All actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

11.1.3  The Court shall have entered orders (or there shall be agreements satisfactory to the Debtor) concerning Claims, any Liens asserted by holders of Claims, and any interests in the Debtor (which may be orders included within the Confirmation Order) that are  required  for  the  feasibility  and implementation of the Plan; and

11.1.4  The Estate shall  have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date.

11.2   Waiver of Conditions. The Debtor may waive one or more of the conditions precedent to the effectiveness of the Plan set forth above, except that the Debtor may not waive the condition that the Estate will have sufficient Cash to meet all payment and funding obligations under the Plan on the Effective Date.

## ARTICLE XII
## RETENTION OF JURISDICTION; CASE CLOSURE

12.1   Retention of Jurisdiction. After the Effective Date, the Bankruptcy Court shall have original jurisdiction of all matters arising in, arising under or related to the Bankruptcy Case or Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code, including but not limited to the following specific matters:

12.1.1 Executory Contracts. The Court shall retain jurisdiction (a) to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and (b) to hear and determine any and all Claims resulting from the rejection of any executory contract or unexpired lease, and any objections to such Claims.

12.1.2 Litigation. The Court shall retain jurisdiction to hear and determine any and all adversary  proceedings, applications, contested matters and other litigated matters pending on the Confirmation Date or filed thereafter, including any and all claims that might be filed by the Reorganized Debtor or the Creditors' Committee under chapter 5 of the Code.

12.1.3 Distributions. The Court shall retain jurisdiction to ensure that the distributions to holders of Claims are accomplished as provided herein.

31

12.1.4. Determine Claims Arising Post-Confirmation. The Court shall retain jurisdiction to determine any Claim or liability to a Governmental Unit which may be asserted as a result of the transactions contemplated herein.

12.1.5 Tax Claims. The Court shall retain jurisdiction to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code.

12.1.6 Objections to Claims. The Court shall retain jurisdiction (a) to hear and determine any objections to Claims filed both before and after the Confirmation Date, (b) to allow or disallow any Claim in whole or in part, (c) to decide any controversies as to the classification of any Claims and/or (d) to estimate any Disputed Claim.

12.1.7 Stay or Reversal of Confirmation. The Court shall retain jurisdiction to enter and implement such orders as may be appropriate in the event Confirmation of the Plan is for any reason stayed, reversed, revoked, modified or vacated.

12.1.8 Compensation. The Court shall retain jurisdiction to hear and determine all applications by  Professionals and others for compensation and reimbursement of expenses.

12.1.9 Plan Modification. The Court shall retain jurisdiction to hear applications, if any, to modify the Plan in accordance with § 1127 of the Bankruptcy Code. After Confirmation of the Plan, the Reorganized Debtor may also, so long as it does not adversely affect the interests of Creditors, institute proceedings in the Bankruptcy Court to remedy  any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Order of Confirmation, in such manner as may be necessary to carry out the purpose and effect of the Plan.

12.1.10 Plan Disputes. The Court shall retain jurisdiction to hear and determine disputes arising in connection with the Plan or its implementation, including without limitation disputes relating to the execution of agreements, documents or instruments required to be executed pursuant to the terms of the Plan, or arising under or relating to the interpretation of agreements, documents or instruments executed in connection with the Plan.

12.1.11 Plan Implementation. The Court shall retain jurisdiction to construe and to take any action to enforce the Plan and issue such orders as may be necessary for the implementation, execution and consummation of the Plan.

12.1.12 Plan Corrections. The Court shall retain jurisdiction to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan.

12.1.13 Creditors' Disputes. The Court shall retain jurisdiction to take any action to resolve any disputes arising out of or relating to any Claim, to hear and determine other issues presented by or arising under the Plan, and to take any action to resolve any disputes of Creditors with respect to their Claims.

12.1.14 Other Matters. The Court shall retain jurisdiction to determine such other matters and for such other purposes as may be provided in the Order of Confirmation or that are not inconsistent with chapter 11 of the Bankruptcy Code.

12.2 Exclusive Jurisdiction. The retention of jurisdiction provided for in this Plan shall be exclusive with respect to all matters set forth herein so as to preserve for the Reorganized Debtor the benefits of the Plan, subject to the Court's power under section 305 of the Bankruptcy Code or 28 U.S.C. § 1334(c) to abstain as to all or part of any proceeding.

12.3 Effectuating Orders. The Bankruptcy Court shall enter all judgments, partial judgments, and Orders necessary to effectuate or enforce the Plan, any term therein or as reasonably requested by any party intended as a direct beneficiary of a material provision of the Plan. Such Orders and decrees may include a permanent injunction effectuating all actions, releases, assignments, transfers and waivers required by the Plan.

12.4 Closure of the Case.

12.4.1 Closing the Bankruptcy Case. As soon as the Debtor determines that there is no further need for administration of the Case by the Bankruptcy Court, the Case shall be closed pursuant to 11 U.S.C. § 350 upon (i) the filing of a final report, (ii) after twenty (20) days notice to parties-in-interest, and (iii) the entry of an appropriate Order by the Court closing the Case.

12.4.2 Post-Confirmation Payments to United States Trustee/Bankruptcy Administrator . Until entry of an Order closing, dismissing or converting the Bankruptcy Case, any quarterly payments due to the office of the United States Trustee/ Bankruptcy Administrator . after the Effective Date of the Plan shall be paid in accordance with 28 U.S.C. § 1930(a)(6) by the Reorganized Debtor.

12.4.3 Reopening Case. At any time, the Debtor or any other party in interest may obtain entry of an order reopening the Bankruptcy Case to obtain any relief or order from the Bankruptcy Court consistent with section 12.1. Although the Debtor may seek such relief on an ex parte basis, the Debtor shall give notice of its motion or other request to the US Bankruptcy Administrator.

## ARTICLE XIII
## MODIFICATION OF THE PLAN

13.1 <u>Revocation or Withdrawal of the Plan</u>. The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Estate or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Estate.

13.2 <u>Amendments Prior to Confirmation</u>. Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with Section 1125 of the Bankruptcy Code.

13.3 <u>Amendments After Confirmation</u>. The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation of the same provided that (a) the Plan, as altered, amended or modified, satisfies the requirements of the Bankruptcy Code and (b) the Bankruptcy Court approves such modifications upon no less than 20 days' written notice to all interested parties and an opportunity to be heard.

13.4 <u>Effect on Acceptance Requirements</u>. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if (a) such Person fails timely to object to the proposed alteration, amendment or modification, or (b) in the event an objection is timely filed, the Court determines the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. The Debtor may correct any defect or omission in this Plan and any exhibit hereto without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders.

13.5 <u>Effect of Modification</u>. Every modification of the Plan will supersede all previous versions of the Plan when such modification becomes effective. Previous superseded versions of the Plan will be deemed to be in the nature of a withdrawn or rejected settlement proposal, and will be of no evidentiary or substantive effect for any purpose whatsoever.

## ARTICLE XIV
## STAYS, INJUNCTIONS AND RELEASES

14.1 <u>Continuation of Injunctions or Stays until Effective Date</u>. All injunctions or stays provided for in the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. Further, unless the Plan provides otherwise, any injunctions or stays ordered by the Bankruptcy Court shall continue in effect through and after the Effective Date.

14.2 <u>Injunction Relating to the Plan</u>. As of the Effective Date, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place,

any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor or its Estate, on account of, or respecting any Claims, debts, rights, Causes of Action or liabilities discharged or treated pursuant to the Plan, except to the extent expressly permitted under the Plan. Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present, future, or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Further, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtor, or who have held, hold or may hold any debt or interest relating to the Debtor, are permanently enjoined, from and after the Effective Date, to the maximum extent permitted by law, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt or interest against the Reorganized Debtor, or (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the immediate or any mediate transferee of any property distributed pursuant to the Plan or of any putative securities, based upon a claim that the transferor's receipt of such property constituted a fraudulent conveyance, preference, violation of bulk sales or other law, or based upon any other claim that receipt and or distribution of property by transfer pursuant to the Plan is wrongful, whether in law or equity.

14.3 <u>Broad Injunction</u>. The intent of this Plan is to provide the broadest possible injunction permitted by law and, to the extent permitted by law, to expand the scope of that injunction for the benefit of the Reorganized Debtor to the extent that, at any time after the Effective Date, the law is clarified or changed to permit such a broader injunction. The injunction in the Confirmation Order shall provide that the holders of Claims shall be enjoined from commencing or continuing any such specified action or proceeding against the Reorganized Debtor with respect to any Claim or property of the Estate, including Claims based in whole or in part on an allegation: (i) that the Debtor breached any contract, with, or any duty or obligation to the Creditor; (ii) that the Debtor was the alter ego or instrumentality of another Person; (iii) that the Debtor made any preferential or fraudulent transfer or any other voidable transfer or payment to any Person; or (iv) that the Debtor is liable for any act or omission.

14.4 <u>Exculpation.</u> Neither the Reorganized Debtor nor any of its attorneys, accountants or agents shall have or incur any liability to any Creditor for any act or omission in connection with or arising out of their administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, and in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and shall be fully protected in acting or in refraining from acting in accordance with such advice. Neither the Committee members, the Creditor Representative, nor any of their attorneys, accountants, or agents shall have or incur any liability for any act or omission in connection with or arising out of the administration of their duties and responsibilities under the Bankruptcy Code and the Plan except for willful misconduct, and the Committee members and the Creditor Representative shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Bankruptcy Code and the Plan and shall be fully protected in acting or in refraining from acting in accordance with such advice.

14.5 <u>Release of Claims</u>. Except as contemplated by the Plan, the rights afforded to holders

of Claims in the Plan shall be in exchange for a complete release, satisfaction and discharge of all Claims against the Debtor, and acceptance of such distributions under the Plan shall be deemed irrevocably to release any and all claims of any type, kind or nature against the Debtor. Persons deemed to have released claims pursuant to this paragraph shall be forever precluded from asserting against the Debtor or the Reorganized Debtor or their respective assets any Claim, including any Claim of the type released or deemed released herein.

14.6 <u>Injunctions against actions against Guarantor(s)</u>. In consideration of the agreement by the Guarantors to waive the administrative expense claim and releasing the Debtor from withholding taxes from the Distribution Fund until revocation, all Creditors holding personal guaranties of the Guarantors for debts of the Debtor shall be enjoined from commencing or continuing, including the issuance or employment of process, against the Guarantors for the purpose of recovering a claim against the Guarantors under any guaranty agreement, until the earlier of July 31, 2022 or an event of default under this Plan. This provision is authorized under 11 U.S.C. §1123, which provides in pertinent part that a chapter 11 plan must "provide adequate means for [its] implementation" and may "modify the rights of holders of secured claims, . . . or unsecured claims . . . and may include any other appropriate provision not inconsistent with applicable provisions of this title. The temporary injunctive relief to the Guarantors is necessary to provide for the implementation of the Plan.

Section 524(g) of the Bankruptcy Code specifically allows an injunction protecting guarantors to be issued if a number of specific conditions are met (dealing with asbestos claims - which conditions are not applicable in this case). However, the legislation took no position on whether a similar injunction could be entered if all of those conditions are not met. 4 Collier on Bankruptcy, ¶ 524.07[2] (16th ed.) (citing 140 Cong. Rec. H10,765 (daily ed. Oct. 4, 1994) (remarks of Rep. Jack Brooks). The legislation enacting section 524(g) also contained a "rule of construction" providing that nothing in the legislation, or the amendments made by it, shall be construed "to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization". Bankruptcy Reform Act 1994, Pub. L. No. 103-394. While, this rule of construction was not actually codified, the language was intended to prevent a negative implication from being drawn that the amendments deal only with asbestos related cases. 4 Collier on Bankruptcy, ¶ 542.07[2] (16th ed.). Thus, the Court may issue an injunction protecting 3rd party guarantors outside asbestos-related cases. See 104 Cong. Rec. H10, 766 (daily ed. Oct. 4, 1994) (remarks of Rep. Brooks) ("The Committee expresses no opinion as to how much authority a bankruptcy court may generally have under its traditional equitable powers to issue an enforceable injunction of this kind. The Committee has decided to provide explicit authority in the asbestos area because of the singular cumulative magnitude of the claims involved. How the new statutory mechanism works in the asbestos area may help the Committee judge whether the concept should be extended into other areas.").

Section 524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt". However the discharge granted the Company under its Plan does not provide that it will discharge any individual guarantor from any debt which is not paid in full under the Plan. In fact, the injunctive relief provided to the guarantors under the Plan is independent from the provisions providing for a discharge of the Company and provides that the injunctive relief is temporary, pending the Company's satisfactory

performance under the Plan, during which performance any statute of limitations governing pursuit of claims against guarantors is tolled. The Fourth circuit has held that where a chapter 11 plan granted protection to non-debtor guarantors, the plan's provisions are binding on the creditors by operation of *res judicata*, and that Section 105 of the Bankruptcy Code allows the court to issue an injunction without regard to section 524. In re A.H. Robbins Co., 880 F2d 694 (4th Cir. 1989), cert. denied, 493 U.S. 959 (1989) (permitting injunction in chapter 11 plan preventing tort claimants from seeking recovery from insurers that had contributed to settlement provided through the plan). The Sixth Circuit also held in <u>In re: Dow Corning Corp.</u>, that a plan granting release of claims against non-debtor third parties will  only be valid in "unusual circumstances". 280 F.3d 648 (6th Cir. 2002). The court then gave seven factors that must be present before a court may enjoin claims against a non-debtor:

(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(2) The non-debtor has contributed substantial assets to the reorganization;

(3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor's being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

(4) The impacted class, or classes, has overwhelmingly voted to accept the plan;

(5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

(6) The plan provides an opportunity for those claimants who choose not to settle to recover in full; and

(7) The bankruptcy court made a record of specific factual findings that support its conclusions.

Id.

All seven of the Dow Corning factors are or are likely present in this case. The Guarantors are contribution significant resources to achieve consummation of the Plan, and pursuit of guarantees held by a limited number of creditors would disrupt and defeat the implementation of the plan by diverting assets intended for the Debtor to payment of specific claims to indemnification costs and awards. Accordingly, the injunctive relief provisions of the Plan are essential to the implementation of the Plan, and do not conflict with any provision of the Bankruptcy Code.

14.7 <u>Statute of Limitations Tolling Agreement</u>.  By their signatures below, and in consideration of the injunction set for in Section 14.6 above which will inure to their personal benefit, Guarantors agree that any and all applicable statutes of limitations, statutes of repose, the doctrine of laches, and all other time-based defenses with respect to any claims against either or both of the Guarantors based on their personal guaranties of claims against the Debtor are hereby tolled starting with the Effective Date and continuing uninterrupted until July 31, 2023 (the "Tolling Period").  The passage of time during the Tolling Period shall not be counted for purposes of any and all applicable statutes of limitations, statutes of repose, laches, or any other time-based defenses in any legal proceeding or arbitration in which any party assert claims covered by this agreement.

The Guarantors agree that they will not assert any defense based on any statute of limitations, statutes of repose, laches or other time-related defense based, in whole or in part, on the passage of time during the Tolling Period.

14.8 <u>Setoffs</u>. Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estate of any rights of setoff the Estate may have against any Person.

## ARTICLE XV
## DEFAULT AND REMEDIES

15.1 <u>Default.</u> Except as otherwise provided in the Plan, in the event Debtor shall default in the performance of any of its obligations under the Plan, then a claimant, upon fifteen (15) day written notice to the Debtor and Debtor's counsel with an opportunity to cure, may pursue such remedies as are available at law or in equity.  An event of default occurring with respect to one claim shall not be an event of default with respect to any other claim.  In the event of a post-confirmation default of the secured payment provided under the Plan and failure to cure within fifteen (15) days' notice thereof, CIT, its assignees or successors, shall have relief from the automatic stay to exercise its rights under its Note, Security Interest, and North Carolina State Law. The default and opportunity to cure notice obligation shall extend until the Plan provisions have been satisfied after confirmation of this Plan.

## ARTICLE XVI
## MISCELLANEOUS

16.1 <u>Severability</u>. If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Debtor, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

16.2 <u>Binding Effect</u>. The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person. Pursuant to 11 U.S.C. § 1141(a), the provisions of this Plan bind the Reorganized Debtor, any Person issuing securities under the Plan, any Person acquiring property or receiving distributions under the Plan, the counter-parties to any executory contracts or unexpired leases with

the Debtor, any and all Creditors or Equity Interest holders of the Debtor, and any and all other Persons referred to or contemplated in this Plan, whether or not the Lien, Claim, Equity Interest or other right of such Person is impaired under the Plan and whether or not such Person has accepted the Plan. To the extent the Bankruptcy Case is converted to chapter 7 or the Reorganized Debtor files a future bankruptcy case, the Claims, Liens, Equity Interests and rights of Creditors and other Persons, as determined and modified by this Plan, shall be final and shall determine the allowed amounts of such claims and interests in the subsequent chapter 7 case or future bankruptcy case.

16.3 <u>Further Assurances</u>. Each Person receiving any payment or other benefit under the Plan, including any holder of any Allowed Claim or Equity Interest, shall execute such documents and shall take such other actions (or omit to take actions) as may be necessary or reasonable in order to effectuate the Plan.

16.4 <u>Notices</u>. All notices, requests and demands to or upon the Debtor or the Creditors' Representative shall only be effective if in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by regular mail or email addressed as follows:

If to the Debtor:

Scotto Restaurant Group, LLC
137 Cross Center Road Suite 234
Denver NC 28037
Email: jscotto@firehousesubs.com

with a copy to:

Bryan W Stone
Stone & Witt, PA
301 S. McDowell St., Suite 1000
Charlotte NC 28204
Email: bstone@swlawnc.com

If to the Creditor Representative:

Don Myers
10935 E. San Felipe Ave
Clovis, California  93619
Email: donmyersmd@sbcglobal.net

with a copy to:

Kiah T. Ford IV
Parker Poe Adams & Bernstein LLP

401 S. Tryon Street, Suite 3000
Charlotte NC 28202
Email: chipford@parkerpoe.com

16.5    Governing Law. Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, construed and enforced in accordance with, the laws of the State of North Carolina, without giving effect to the principles of conflicts of law of such jurisdiction.

16.6    Creditors' Committee. Upon the Effective Date, except with respect to (1) applications for allowance of professional fees and expenses, (2) investigating and pursuing claims and causes of action against Justin Scotto, Stephanie Scotto, and/or Christopher Scotto, and (3) filing and prosecuting claims objections, the Creditors' Committee shall automatically dissolve, whereupon the members, professionals, and agents of the Creditors' Committee shall be released from any further duties and responsibilities under applicable law. Those enumerated rights and duties shall extend for a period of 6 months after the Effective Date.  Thereafter the Committee shall exist for the sole purpose of continuing to prosecute any motions, objections, or actions commenced by the Committee before the expiration of the foregoing 6 month period; provided, however, that the Committee shall be completely dissolved 1 year after the Effective Date unless an extension is granted by the Bankruptcy Court for cause after notice and a hearing.

16.7    Post-Confirmation Fees, Final Decree. The Debtor shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. § 1930 and the filing of required post-confirmation reports, until a final decree and/or Order closing the Bankruptcy Case is entered. Pursuant to  28 U.S.C. §1930(a)(6), such fees will be determined by the disbursements in the quarter or if a portion thereof, the disbursements up until the case is closed.

16.8    Filing of Additional Documents. On or before the Effective Date of the Plan, the Debtor shall file with the Bankruptcy Court any agreements or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

16.9    Prepayment Option. The Debtor may prepay any Class of claims, in part or in full, at any time following confirmation of the Plan, without penalty or payment of unaccrued interest.

16.10    Inconsistency. In the event of any inconsistency between the Plan and the Disclosure Statement, or any other instrument or document created or executed pursuant to the Plan, the terms of the Plan shall govern.

## ARTICLE XVII
## UNCERTAINTIES REGARDING THE PLAN

A.      Uncertainty of Tax Consequences

17.1    The confirmation and execution of the Plan may have tax consequences to holders of claims and interests.  The Debtor does not offer an opinion as to any federal, state, local or

40

other tax consequences to holders of claims and interests as a result of Confirmation. All holders of claims and interests should satisfy themselves as to such tax consequence by obtaining independent advice from their own professional advisors.

B.    Uncertainty of Claims Resolution Process

17.2    The Debtor cannot predict the ultimate disposition of the claims against the Debtor's estate. The allowance, disallowance, subordination or other resolution of claims in some presently unknown combination could have a major impact on the percentage amounts to be paid ultimately on claims.

C.    Alternatives to the Plan/Feasibility

17.3    The Debtor's financials and projections ("Business Plan") are attached to this Disclosure Statement and Plan as Exhibit "A" (the "Plan Projections") and Exhibit "B" (most recent accounting period profit and loss statement). The Business Plan reveals the Debtor's most recent profit and losses for the Firehouse proprietary accounting period (Exhibit "B"), which is paramount to understanding the Plan Projections contained in Exhibit "A". The significance of Exhibit "B" is that it reflects the recent price increases on goods sold, which shows a significant increase over prior accounting periods and statements made to this Court. The increased numbers also reveal that the Debtor has not seen any nor anticipates any significant short term loss of customers as a result. Accordingly, based on the numbers contained therein, the Debtor can more accurately forecast its profit and losses over the long term, including the term of the Plan Payments. As such, the Debtor is recognizing significant profitability factors in nearly every store that is operated. In light of traditional pre-petition financial struggles and the higher-than-average rent expenses for a metropolitan city, the profit margins are well in line if not in excess of the average Firehouse margins as revealed in the report by the Finley Group.

As to the Plan Projections, several assumptions were used. First, the Debtor assumes sales increases of three percent (3%) per annum. While the Debtor anticipates a higher return than that based on the most recent year, it bases its projections on this conservative growth factor to avoid skeptical creditors. Second, in a sales business of this nature, flexible spending, such as employee wages and vendor costs, are factored as a percentage of net sales. It is Firehouse's financial model to carry these percentages as an ongoing concern, such that if those flexible expenses should increase in the future, the price model will be adjusted upwards in order to maintain percentage costs. Inflexible costs, such as rent expense and Franchise fees are constant. The Debtor has deducted the revenue and expenses associated with the Dale Earnhardt Blvd. store in light of the sale of that store. Also, the Debtor anticipates the business personal property lease at the Epicentre location to be paid in full in approximately one (1) year, which will allow the returns to come in line with the other store locations.

This Plan allows the net income of the Debtor to be paid directly to creditors. Save the Cash Reserve Amount, every semi-annual Distribution Date the Debtor will transfer all monies held in the operating account to the Distribution Account. The Debtor has proposed to do so until a 100% payout is achieved. Simply stated, the Debtor's proposal will allow creditors, in particular Class 3 creditors, significantly more return than that contemplated by the Finley Group per

liquidation.  Allowing the Debtor to remain in business is not only feasible, but provides the best outcome for all claimants.

17.4    The Debtor believes that the Plan provides holders of claims with the greatest possible value that could be realized on their respective claims.  The alternatives to Confirmation of the Plan are : (1) confirmation of an alternative plan of reorganization submitted by another party in interest; (2) liquidation of the Debtor under Ch. 7 of the Bankruptcy Code; (3) installation of a liquidating trustee via the Chapter 11; or (4) dismissal of the bankruptcy proceedings.  The Debtor believes that neither liquidation nor dismissal are in the best interests of claimants and that a reorganized Debtor per the Plan as a going concern provide claimants the greatest rate of return.

<u>CONCLUSION</u>

Based on the proposals contained herein, this Amended Disclosure Statement and   Plan provides the best opportunity for claimants and remains the best viable option as a going concern over liquidation or dismissal.

Hereinafter Agreed to and Ratified by:

This the 30th  day of November, 2012.

/s/

_____

Justin Scotto, President and Owner of

Scotto Restaurant Group, LLC

Debtor in Possession

This the 30th day of November, 2012.

STONE & WITT, P.A.
Attorneys for Debtor

/s/

_____

Bryan W. Stone
N.C. Bar No. 32943
301 S. McDowell St., Suite 1000
Charlotte, North Carolina 28204
(704) 333-5184
bstone@swlawnc.com

**CONSENT TO TOLLING AGREEMENT:**

_____ (SEAL)
Justin Scotto

_____ (SEAL)
Stephanie Scotto

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | CASE NO.  11-40506 |
| SCOTTO RESTAURANT GROUP, LLC | ) | CHAPTER 11 |
| | ) | |
| | ) | |
| | ) | |
| _____ DEBTOR. | ) | |

CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the Fourth **AMENDED Disclosure Statement and Plan** by either Electronic Case Filing as indicated or depositing copies of same in the exclusive care and custody of the United States Postal Service, with proper postage thereto affixed as follows:

Linda W. Simpson                              Bradley E. Pearce

United States Bankruptcy Administrator        KATTEN MUCHIN ROSENMAN LLP

_Via Electronic Service_                      550 South Tryon Street, Suite 2900

                                              Charlotte, NC 28202-4213

Ashley A Edwards                              W. Chris Parnell
Katherine Rose Trotter
Kiah T. Ford, IV                              Patricia L. Rhame
PARKER, POE, ADAMS &

43

BERNSTEIN L.L.P.

Attorneys for Unsecured Creditors
Committee

*Via Electronic Case Filing*

CAUDLE & PARNELL, PLLC

2101 Rexford Road, Ste. 165 W

Charlotte, NC 28211


Joseph W. Grier, III

A. Cotten Wright

GRIER FURR & CRISP, P.A.

101 North Tryon Street, Suite 240

Charlotte, NC 28246

James M. Sullivan

Assistant U.S. Attorney

Carillon Building

272 W Trade Street, Suite 1650

Charlotte, NC 28202


Stacy Cordes

BURT & CORDES, PLLC

122 Cherokee Road, Suite 1

Charlotte, NC 28207

Clint S. Morse

BROOKS PIERCE MCLENDON HUMPHREY &
LEONARD, LLP

P.O. Box 26000

Greensboro, NC 27420

All other parties in interest.
Via Electronic Service or US Postal Service


This the ____ day of November, 2012.

STONE & WITT, P.A.
Attorneys for Debtor

*/s/*_____
Bryan W. Stone
N.C. Bar No. 32943
301 S. McDowell St., Suite 1000
Charlotte, North Carolina 28204
(704) 333-5184
bstone@SWlawNC.com